UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| HAROLD E. SERGENT, | ) | |
| | ) | |
| Appellant, | ) | Civil No. 11-129-ART |
| | ) | |
| v. | ) | |
| | ) | |
| TAFT A. MCKINSTRY, | ) | |
| as Trustee of the BD Unsecured Creditors | ) | |
| Trust, et al., | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |
| TAFT A. MCKINSTRY, | ) | |
| as Trustee of the BD Unsecured Creditors | ) | |
| Trust, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 11-133-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| HAROLD E. SERGENT, et al., | ) | **& ORDER** |
| | ) | |
| Respondents. | ) | |
| | ) | |

*** *** *** ***

Location matters.  When King Leonidas and the Greeks chose to make their stand at Thermopylae, the narrow mountain pass "largely neutralize[d]" the Persians' strong cavalry and enabled the Greek force to inflict massive casualties on a Persian army more than twenty times its size.  *See* Ben Dupré, <u>Where History Was Made: Landmarks of World History from Thermopylae to Ground Zero</u> 11–12 (2009).  During the American Revolutionary War, the militia fought from behind hills and trees rather than in the open field, employing guerilla

tactics to turn the strength of the British line formations into a weakness.  *See generally* Mark V. Kwasny, Washington's Partisan War, 1775–1783, chs. 4–5 (1998).  By choosing their battlefields, these armies shaped the rules of engagement.

The same is often true in litigation.  Although Sergent's appeal and the Plaintiff's motion to withdraw raise complex and novel issues, they distill to a single question: where should this litigation take place?  The Bankruptcy Court should not have abstained from hearing the claims against Sergent, and the Plaintiff is entitled to a jury trial on her claims. Yet because the motion to withdraw is premature, the parties must stay in Bankruptcy Court until the case is trial-ready.

## BACKGROUND

### A.    The Underlying Bankruptcy

Any coal mining case that does not mention black diamonds "would be a much duller affair" than Hamlet without the prince.  *Cinkovitch v. Thistle Coal Co.*, 121 N.W. 1036, 1038 (Iowa 1909).  History makes clear that two factors earned coal its nickname: value and durability.  In the United States, coal spurred the building of the nation's first railways and helped lay the foundations for the beginning of the Industrial Revolution.  Albert Sidney Bolles, Industrial History of the United States 710 (Henry Bill Publishing 3d ed. 1878).  Near the end of the nineteenth century, the value of coal mined in the nation was "equal to that of all the gold, silver, and iron produced."  *Id.* at 704.  America's "diadem of economic wealth" continued to sparkle with black diamonds into the twentieth century, *In re Hudak's Estate*, 118 A.2d 577, 584 (Pa. 1955) (Musmanno, J., dissenting), and coal continued its "industrial supremacy," Frederick Robert Worts, Modern Industrial History 158 (1919).

Harold Sergent was probably trying to dig up similarly auspicious prospects by naming his coal company after the black diamond.  After all, Sergent and James Campbell founded the Black Diamond Mining Company and its seven affiliates (collectively, "Black Diamond") to buy promising but undeveloped coal assets in Floyd County, Kentucky, and turn a profit.  Compl., *McKinstry v. Sergent*, 442 B.R. 567 (E.D. Ky. 2011) (Pikeville No. 10-110-ART), R. 1-1 at 10 ¶ 11.  After putting up some of his own money, Sergent turned to a consortium of lenders, led by CIT Capital USA, Inc., to finance the purchase of these assets.  *Id.* at 11 ¶ 12.

According to the Plaintiff's complaint, the following events then ensued.  While in charge of Black Diamond, Sergent engaged in self-dealing and mismanaged the company.  *Id.* at 24 ¶ 54.  In 2006, he caused Black Diamond to enter a Consulting & Sales Agreement with another company that Sergent founded, Global Energy Holdings, LLC.  *Id.* at 11 ¶ 13.  Under this agreement, Black Diamond appointed Sergent and Global Energy as its exclusive agents for selling coal and paid them $0.25 per ton of coal that Black Diamond mined or sold, with a minimum monthly payment of $30,000.  Consulting & Sales Agreement, *McKinstry v. Sergent* (*In re Black Diamond Mining, LLC*), No. 11-07010-JMS (Bankr. E.D. Ky. 2008) [hereinafter "*Adversary Proceeding*"], R. 19-1 at 3 ¶¶ 6–7.  Not long afterwards, Black Diamond, under Sergent's direction, entered a Royalty Agreement with one of its lenders, CIT Capital.  Compl., *McKinstry*, 442 B.R. 567 (No. 10-110), R. 1-1 at 12 ¶ 15.  In exchange for financing the purchase of the Floyd County coal assets, Black Diamond agreed to pay royalties of $0.05 per ton to CIT Capital and $0.04 per ton to Sergent and Campbell.  Royalty Fee Agreement, *Adversary Proceeding*, R. 19-2 at 2–3 ¶¶ 2–3.  These agreements allegedly created a conflict of interest for Sergent.  He was caught between his incentive to

3

maximize his personal income by selling as much coal as possible regardless of whether Black Diamond would profit and Black Diamond's interest to "sell only as much coal as it could profitably mine."  Compl., *McKinstry*, 442 B.R. 567 (Pikeville No. 10-110-ART), R. 1-1 at 12 ¶ 16.

Succumbing to the incentive to produce or sell as much coal as possible, Sergent committed Black Diamond to long-term Supply Contracts with coal purchasers to sell more coal than Black Diamond could produce from its own mines.  *Id.* at 12–13 ¶ 17.  To make up the shortfall between the amount it could produce and the amount it was obligated to sell, Black Diamond purchased the difference on the spot market.  *Id.*  Of course, this strategy was profitable so long as the price of purchasing coal on the spot market remained less than the selling price under the Supply Contracts, which topped out at about $52 per ton.  *Id.* at 13 ¶ 18.

Although successful for the first two years, this strategy turned out to be a disastrous gamble when coal prices surpassed the $52 break-even point.  *Id.*  Concerned about the company's continued ability to satisfy its liabilities, CIT Capital insisted that Black Diamond hire Alvarez & Marsal North America, LLC ("A&M") as a financial advisor.  *Id.* at 14 ¶ 23. But this was all for naught.  The spot market price of coal continued to rise, and Black Diamond was unable to restructure the Supply Contracts.  *Id.* at 14 ¶ 22; *see also* Appellant's Br., *Sergent v. McKinstry*, Pikeville No. 11-129-ART (E.D. Ky. 2011), R. 7 at 13.  By early 2008, the spot market price of coal reached $70 to $80 per ton, which meant that Black Diamond lost $20 to $30 for each ton of coal it bought to satisfy its contractual obligations. Compl., *McKinstry*, 442 B.R. 567 (Pikeville No. 10-110-ART), R. 1-1 at 13–14 ¶ 21.

With their borrower's liabilities rapidly outstripping its assets, Black Diamond's lenders needed a new plan of attack.  In February 2008, CIT Capital and the other lenders turned to the Chapter 11 bankruptcy process with the hope of reorganizing Black Diamond as a profitable company.  The lenders filed involuntary petitions to drag Black Diamond and its seven subsidiaries into bankruptcy.  *See, e.g.,* Chapter 11 Involuntary Pet., *In re Black Diamond Mining Co.,* No. 08-70066-JMS (Bankr. E.D. Ky. 2008) [hereinafter "*Underlying Bankruptcy*"], R. 1.

Up to this point, Black Diamond had not lived up to a name suggesting value and durability.  Rather, once in bankruptcy, Black Diamond's name was more akin to the ski symbol indicating the need for expertise before continuing downhill.  The Bankruptcy Court had to decide what kind of experts were needed to reorganize Black Diamond and help pull it back from the brink of financial collapse.  For their part, CIT Capital and the other lenders moved for the appointment of a bankruptcy trustee to manage Black Diamond's estate.  Mot. Appoint Trustee, *Underlying Bankruptcy*, R. 2.  But rather than engage in a prolonged fight over the appointment of a trustee, the parties agreed to create a new senior management position within Black Diamond—Chief Restructuring Officer ("CRO")—and to appoint a specialist in turnaround management from A&M to this position.  CRO Order, *id.*, R. 56.  Accordingly, the Bankruptcy Court authorized Black Diamond to hire an A&M employee, Ira Genser, as its CRO.  *Id.* at 2.  Because Genser was not a court-appointed trustee under the Bankruptcy Code, CIT Capital withdrew its motion for a trustee, but reserved the ability to renew it in the future.  *Id.* at 6 (ordering that CIT Capital's motion to appoint a Chapter 11 trustee is "withdrawn, without prejudice").

The Bankruptcy Court gave Genser, as CRO, all of the powers necessary to run and restructure Black Diamond, including the power to hire and fire employees. *Id.* at 2–4 (listing all of the CRO's powers). So Genser hired his A&M colleague, Larry Tate, as Black Diamond's Chief Financial Officer ("CFO"). Engagement Letter, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 ¶ 1.a(ii). Consistent with the requirements of the CRO Order, Black Diamond and A&M entered into a court-approved Engagement Letter that described the relationship between Black Diamond and A&M. This Engagement Letter detailed the scope of A&M's turnaround management services, Genser's hiring as CRO, and Tate's hiring as CFO. *See generally id.*; *see also Underlying Bankruptcy*, R. 439 (order approving Engagement Letter).

After A&M took over Black Diamond's day-to-day management, the Bankruptcy Court authorized Black Diamond to reject the Consulting & Sales Agreement and the Royalty Agreement that caused Black Diamond's financial troubles. *Id.*, R. 407. Unhappy that he would not receive payments promised to him under these agreements, Sergent filed proofs of claim in Black Diamond's bankruptcy case to recover these payments from Black Diamond's bankruptcy estate. He sought about $4.6 million in unpaid royalties, Claim Nos. 1259 & 1260, *id.*, R. 2008 Ex. B, $28.8 million in unpaid commissions, Claim No. 1261, *id.*, R. 2007 Ex. A, and $700,000 for unpaid loans that he made to Black Diamond, Claim Nos. 1257 & 1258, *id.*, R. 2009 Ex. C.

Meanwhile, even restructuring specialists A&M, Genser, and Tate (collectively, the "A&M Defendants") could not prevent the spot market price of coal from nearly doubling during the summer of 2008, reaching peaks not seen since World War II. Compl.,

*McKinstry*, 442 B.R. 567 (Pikeville No. 10-110), R. 1-1 at 17 ¶ 37.  Black Diamond teetered on the edge of financial ruin.

According to the Plaintiff, Black Diamond's troubles were not caused by Sergent alone: the A&M Defendants also contributed to the company's financial problems.  *Id.* at 25–27 ¶¶ 60–63.  For example, in August 2008, the Plaintiff claims that Genser and Tate ignored the advice of Black Diamond's senior management and employees and rejected an offer that would have "lock[ed] in a $30 million profit" for the company.  *Id.* at 21 ¶ 42.  Instead of a diversified approach, Genser and Tate put all their coal into one mine cart and attempted to sell the company to a competitor.  Despite only having the interested purchaser's nonbinding letter of intent, Genser and Tate rejected multiple profitable opportunities for Black Diamond.  *Id.* at 21–22 ¶¶ 41–47.  Genser and Tate, the story goes, were committed to following the preferences of CIT Capital and the other lenders regardless of whether those preferences were in Black Diamond's best interests.  *Id.* at 22 ¶ 47.

Unlike their cousins, black diamonds are not forever.  After the global economic collapse in the fall of 2008, the spot market price of coal fell precipitously, and with it, the value of Black Diamond itself.  Appellant's Br., *Sergent v. McKinstry*, Pikeville No. 11-129-ART (E.D. Ky. 2011), R. 1 at 15.  These circumstances proved too much for the company to bear, and Black Diamond "encountered the fate which hangs like a black cloud over every coal miner's destiny."  *In re Hudak's Estate*, 118 A.2d at 584 (Musmanno, J., dissenting).

With the hope of reorganization gone, Black Diamond filed a plan of liquidation, which the Bankruptcy Court confirmed in July 2009.  *See* Confirmation Order, *Underlying Bankruptcy*, R. 1562.  The Plan created the BD Unsecured Creditors Trust to liquidate some of the assets of Black Diamond's bankruptcy estate, including any causes of action that

Black Diamond might have against Sergent and the A&M Defendants.  Third Am. Joint Plan of Liquidation, *id.*, R. 1562 Ex. A art. IV(C).  Pursuant to the Plan, the Bankruptcy Court also appointed Taft A. McKinstry (the "Plaintiff") as the Trustee for the BD Unsecured Creditors Trust and as the representative of Black Diamond's estate.  Confirmation Order, *id.*, R. 1562 at 34–35.

Anticipating litigation of Black Diamond's causes of action, the Plaintiff and the A&M Defendants entered a Settlement Agreement.  Settlement Agreement, *id.*, R. 1562 at 160–170 (Ex. B).  Under the Settlement Agreement, the Plaintiff agreed to limit her recovery for claims covered by various insurance policies, but not to limit her recovery for claims that fell outside the insurance coverage.  *Id.* at 165 ¶ 6.

## B.       The Plaintiff's Lawsuit Against Sergent and A&M

This long-brewing showdown among the three parties finally came to a head. Entrusted with liquidating the causes of action and obtaining a recovery for the unsecured creditors, the Plaintiff sued Sergent and the A&M Defendants in state court.  Compl., *McKinstry*, 442 B.R. 567 (Pikeville No. 10-110-ART), R. 1-1.  She asserted breach of fiduciary duty and gross negligence/willful misconduct claims against Sergent for his pre-petition mismanagement of Black Diamond (the "Sergent Claims").  *Id.* at 24–25 ¶¶ 53–59. She also asserted gross negligence/willful misconduct claims against the A&M Defendants for their post-petition mismanagement of Black Diamond (the "A&M Claims").  *Id.* at 25–27 ¶¶ 60–73.  The defendants then successfully removed the case to this Court.  *See* Mem. Op. & Order, *McKinstry* , 442 B.R. 56 (Pikeville No. 10-110-ART), R. 63.

Although the Court confirmed its removal jurisdiction over the case, "difficult issues" remained, particularly whether mandatory abstention applied to the Sergent Claims and

whether the Sergent Claims were core or non-core.  *Id.* at 3–4.  Because the "Bankruptcy Court's familiarity with the case" would aid the resolution of these difficult issues, the Court referred the entire case to the Bankruptcy Court.  *Id.* at 19.

## C.     The Bankruptcy Court's Abstention Order

Back before Bankruptcy Court, the Plaintiff asked the Bankruptcy Court to abstain from hearing the case and remand both sets of claims to state court.  *Adversary Proceeding*, R. 17.  The Bankruptcy Court granted this motion with respect to the Sergent Claims, but denied this motion with respect the A&M Claims.  Mem. Op., *id.*, R. 26 at 18 ("Abstention Order").   According to the Bankruptcy Court, abstention from the Sergent Claims was mandatory under 28 U.S.C. § 1334(c)(2) in part because the Sergent Claims are  non-core proceedings under the Bankruptcy Code.  *Id.* at 12.  Consequently, the Bankruptcy Court remanded the Sergent Claims back to state court.  *Id.* at 16.  For the A&M Claims, however, the court held that both mandatory abstention under § 1334(c)(2) and permissive abstention under § 1334(c)(1) were inappropriate largely because the A&M claims were core proceedings.   *Id.* at 12 (discussing mandatory abstention), 17 (discussing permissive abstention).   This decision severed the case in two, with the state court to adjudicate the Sergent Claims and the Bankruptcy Court to decide the A&M Claims.  The Bankruptcy Court also held all further proceedings on Sergent's proofs of claims in abeyance until the state court resolved the Sergent claims.  Abeyance Order, *Underlying Bankruptcy*, R. 2052.

Like most split decisions, no one was entirely happy.  Sergent appealed.  *Sergent*, Pikeville No. 11-129-ART, R. 1.  Meanwhile, the Plaintiff moved to withdraw this Court's reference of the case to the Bankruptcy Court so that this Court could adjudicate it.

*McKinstry*, Pikeville No. 11-133-ART, R. 1.  Both the appeal and the motion to withdraw are now before this Court.

### DISCUSSION

**I.     Whether the A&M Claims and Sergent Claims Are Core or Non-Core Proceedings**

Because both the appeal and the motion to withdraw partly turn on whether the Sergent and A&M Claims are core or non-core proceedings, the Court addresses this issue at the outset.  *Accord Comm. of Unsecured Creditors v. Motorola, Inc.* (*In re Iridium Operating LLC*), 285 B.R. 822, 829 (S.D.N.Y. 2002) (quoting *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1101 (2d Cir. 1993)) ("A district court considering whether to withdraw the reference should first evaluate whether the claim is core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn.").  District courts have subject-matter jurisdiction over proceedings that arise under Title 11, that arise in a case under Title 11, and that are "otherwise related to a case under Title 11."  *See Stern v. Marshall*, 564 U.S. ___, 131 S. Ct. 2594, 2605 (2011).  The first two types are "core proceedings," while those that are otherwise related to a Title 11 case are "non-core proceedings."  *Id.*  District courts may choose to refer any of these types of proceedings to the bankruptcy court, 28 U.S.C. § 157(a), but a bankruptcy court's authority varies depending on the type of proceeding involved, *Stern*, 131 S. Ct. at 2604.  In core proceedings, bankruptcy courts are empowered to enter final judgments, which are subject to conventional appellate review.  28 U.S.C. §§ 157(b)(1), 158; Fed. R. Bankr. P. 8013.  By contrast, in non-core proceedings, bankruptcy courts may only "submit proposed findings of fact and conclusions of law to the district court."  28 U.S.C. § 157(c)(1).  In this case, the

A&M Claims are core proceedings.  The Sergent Claims are also core proceedings under the statute, but it would be unconstitutional for the Bankruptcy Court to enter final judgment on them.

### A.    The A&M Claims are core.

Because the Plaintiff did not cross-appeal, she is bound by the Bankruptcy Court's classification of the A&M Claims as core proceedings.  A bankruptcy court's classification of a proceeding as core or non-core is "itself a core proceeding."  1 William L. Norton, Jr., Bankruptcy Law & Practice § 4:69 (3d ed. 2011); *see also Maurer v. Maurer* (*In re Maurer*), 271 B.R. 207, 209 (Bankr. M.D. Fla. 2002); *Lesser v. A-Z Assocs.* (*In re Lion Capital Group*), 63 B.R. 199, 209 (S.D.N.Y. 1985).  Consequently, such a classification is "subject only to conventional appellate review."  1 Norton, Bankruptcy Law & Practice § 4:69.  If the bankruptcy court's classification occurs in an interlocutory fashion, then the party wishing to challenge it must seek permission from the district court for an interlocutory appeal under 28 U.S.C. § 158(a).  *Id.*  Otherwise, the party challenging the classification must wait to appeal a final order that brings up the core/non-core classification.  *Id.*

Here, deciding whether to abstain from the A&M Claims required the Bankruptcy Court to determine whether the A&M Claims are core.  The Plaintiff did not cross-appeal. "Absent a formal appeal," this Court cannot revisit the Bankruptcy Court's classification of the A&M Claims as core proceedings.  *Big Rivers Elec. Corp. v. Green River Coal Co., Inc.*, 182 B.R. 751, 755 n.4 (W.D. Ky. 1995).

Eager to avoid the procedural bar to her challenge, the Plaintiff claims that the Bankruptcy Court's classification is non-binding because it is part of the court's reasoning. Pl.'s Reply, R. 5 at 18.  Relying on the maxim that "courts do not bind parties to their

reasoning" but "only to their results," the Plaintiff says that the Bankruptcy Court's core classification of the A&M Claims is non-binding. *Id.* (citing *United States v. Schilling* (*In re Big Rivers Elec. Corp.*), 355 F.3d 415, 442 (6th Cir. 2004)).

The Plaintiff's application of this maxim makes a mountain out of a molehill.  Of course, the reasoning of a decision, *on its own*, is not binding on an appellate court.  *See, e.g., Spierer v. Federated Dep't Stores, Inc.* (*In re Federated Dep't Stores, Inc.*), 328 F.3d 829, 833 (6th Cir. 2003).  This maxim only means that an appellate court can affirm the lower court's judgment on any ground fairly presented by the record, even if the reviewing court disagrees with the lower court's reasoning for that judgment.  *See, e.g., United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006); *City Mgmt. Corp. v. U.S. Chem. Co, Inc.*, 43 F.3d 244, 251 (6th Cir. 1994).  Here, the Bankruptcy Court's classification of the A&M Claims as core was not merely reasoning, but also a holding necessary to its ultimate conclusion that both mandatory and permissive abstention did not apply to the A&M Claims. *See infra* Part II (explaining that one of the requirements for mandatory abstention is that the claim at issue is non-core).

To avoid the binding effect of the Bankruptcy Court's determination, the Plaintiff should have cross-appealed the Abstention Order's refusal to mandatorily or permissively abstain from hearing the A&M Claims.  As part of the basis for that cross-appeal, the Plaintiff should have challenged the Bankruptcy Court's determination of the A&M Claims as core.  Indeed, Sergent used this precise procedural route to challenge the Bankruptcy Court's non-core determination and resulting abstention.

As a last-ditch effort, the Plaintiff argues that she is not bound because the Abstention Order "did not purport to be a final order as to whether the [b]ankruptcy [c]ourt has 'core'

jurisdiction for all purposes."  Pl.'s Reply, *McKinstry*, Pikeville No. 11-133-ART, R. 5 at 18.

This contention is wrong.  The Bankruptcy Court did not place any limits on its core/non-

core determinations.  More importantly, the Plaintiff offers no support for the proposition

that whether a proceeding is core varies depending on the issue before the Court.  And

neither does the statute.  Therefore, by failing to appeal the Abstention Order, the Plaintiff is

bound by the Bankruptcy Court's determination that the A&M Claims are core.

Consequently, this Court is powerless to reach the Plaintiff's contentions on the merits of this

question.  *See, e.g., After Six, Inc. v. Abraham Zion Corp.* (*In re After Six, Inc.*), 167 B.R. 35,

40 (E.D. Pa. 1994) ("[T]he bankruptcy rules for filing a notice of appeal are mandatory and

jurisdictional, and thus failure to file a timely notice of appeal deprives the district court of

jurisdiction to review a bankruptcy court's final order or judgment.")

      **B.**      **It is unconstitutional to treat the Sergent Claims as core proceedings for**
              **purpose of adjudicating them.**

A big-picture point before deciding whether the Sergent Claims are core: the Plaintiff

wants the Sergent and A&M claims tried together.  Although her first preference is state

court, she prefers to have the entirety of the case in one place rather than split between state

and federal court.  *See, e.g.,* Mots. Hr'g Tr., *Sergent*, Pikeville No. 11-129-ART, R. 31 at 20

(Mr. Goroff: "Since we don't . . . at this point, although it depends on the ruling of the appeal

of the abstention, know that they can be together in state court, which I think is our optimal

preference, if they're going to be in federal court, we certainly prefer them to be before

you."); *id.* at 36 (Mr. Goroff: "[O]ur optimal choice is to have these tried together.  And

while we believe that that's appropriate in Kentucky court, we are absolutely fine with Your

Honor trying them together."); *id.* (Mr. Goroff: "But if you ask what our druthers are, Your

Honor, now that A&M is before you, we would like everything done together before you. And we believe it is possible because Your Honor, unlike [Bankruptcy] Judge Scott, does have supplemental jurisdiction."). Sergent likewise does not want the claims against him severed from the A&M Claims. *See, e.g.*, *id.* at 36 (Mr. Geller: "I completely agree; these [two sets of claims] need to be kept together."). Because the A&M Claims are core, the parties' unusual position *almost* renders the Court's ruling on whether the Sergent Claims are core as well as Sergent's appeal an academic exercise. *See infra* Part III (concluding that the Plaintiff's case against both defendants must eventually be withdrawn because the Plaintiff has a jury trial right on all of her causes of action). Almost, but not quite, because parties generally cannot undo the Bankruptcy Court's rulings merely by their agreement after the fact. And so the Court must forge onward.

Although the Sergent Claims are statutorily core, allowing the Bankruptcy Court to enter final judgment on them would be unconstitutional. As first-year law students learn in Civil Procedure, a litigant has to punch two tickets to keep her claim in the federal courthouse: statutory and constitutional.

### (1)    *The Sergent Claims are core proceedings under the Bankruptcy Code.*

The Sergent Claims come within the statutory ambit of "core." Congress has not defined "core proceedings." Instead, in 28 U.S.C. § 157(b)(2), Congress provides a non-exhaustive list of examples of core proceedings. One of the examples—"counterclaims by the estate against persons filing claims against the estate," § 157(b)(2)(C)—describes the Sergent Claims. Sergent filed proofs of claim against the estate in the Bankruptcy Court. In turn, the Plaintiff filed the Sergent Claims against Sergent in state court. *See Stern*, 131

S. Ct. at 2605 (holding that a debtor's claim against a creditor, who had filed a proof of claim against the debtor's estate, was a "counterclaim" within § 157(b)(2)(C)).

The Plaintiff quarrels with this conclusion on two grounds. First, she asserts that the Sergent Claims are not "counterclaims" because the opposing parties in the Sergent Claims are not the same as those in the Proofs of Claim. Appellee's Br., *Sergent*, Pikeville No. 11-129-ART, R. 8 at 13–14. With respect to the Sergent Claims, the Plaintiff argues that Black Diamond's director & officer insurance providers ("D&O Insurers") are the real parties in interest because the Plaintiff and Sergent have agreed to limit the Plaintiff's recovery to the amount of these policies. *Id.* at 13. And with respect to the Proofs of Claim, the Plaintiff argues that the real party in interest is Sergent's personal bankruptcy trustee Phaedra Spradlin—and not Sergent himself—because the Proofs of Claim are assets of Sergent's personal bankruptcy estate. *Id.*

The Plaintiff is correct that § 157(b)(2)(C) requires mutuality of parties. The Bankruptcy Code does not define the term "counterclaim." But in all other settings, a counterclaim requires the same opposing parties as those on each side of the "v." in the underlying claim. *Cf.* 6 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1404 (3d ed. 2011) (citing Fed. R. Civ. P. 13) ("The general rule appears to be that in an action brought in a representative capacity, a defendant cannot assert a counterclaim against plaintiff in plaintiff's individual capacity because it would not be a counterclaim against an 'opposing party.'"). Indeed, Federal Rule of Civil Procedure 13(h) expressly governs how to bring nonparties into a lawsuit for the purpose of adding them to a counterclaim. This rule would be unnecessary if counterclaims could be brought against parties not present in the original claim. This understanding of "counterclaim" comports

with how the term "counterclaim" is normally used in litigation.  *See* Black's Law Dictionary (9th ed. 2009), *available at* Westlaw BLACKS (defining "counterclaim" as a "claim for relief asserted *against an opposing party* after an original claim has been made) (emphasis added).  Section 157(b)(2)(C) therefore requires mutuality of parties.

Although the Plaintiff is correct that counterclaims require mutuality of parties, she is incorrect about whether the Sergent Claims meet that requirement because she misidentifies the real parties in interest.  The D&O Insurers do not replace Sergent as the real party in interest in the Sergent Claims just because the Plaintiff has limited her recovery to the amount of the D&O insurance.  An insurer only replaces its insured as the real party in interest to the extent that the insurer has activated its subrogation rights—in other words, if the insurer actually paid part or all of the claim or otherwise made an enforceable promise to pay the claim.  *See United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 382 (1949); *see also* 6A Wright & Miller, Federal Practice & Procedure § 1546 ("If no money or enforceable promise to pay money has been advanced, then there has not been any subrogation and the insured remains the real party in interest.").  The record does not indicate that Sergent's insurer has agreed to pay any of the losses alleged in the Sergent Claims, so the D&O Insurers are not the real party in interest.

So who is?  In fact, the real party in interest for the Sergent Claims is the same as the real party in interest for the Proofs of Claim: the trustee for Sergent's personal bankruptcy estate, Phaedra Spradlin.  The Proofs of Claim are assets of his personal bankruptcy estate. Voluntary Pet., *In re Harold Edwin Sergent*, No. 10-50763-JL (Bankr. E.D. Ky. 2010), R. 1 at 32.  The Sergent Claims are liabilities of his personal bankruptcy estate.  *Id.* at 37.  And the Bankruptcy Court has not exempted these sets of claims from the property of Sergent's

16

personal estate, nor does the Plaintiff offer a valid basis on which the Bankruptcy Court could do so.  11 U.S.C. § 541(a)(1) (defining the bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case"); *see also Wieburg v. GTE Sw., Inc.*, 272 F.3d 302, 306 (5th Cir. 2001) (holding that the trustee of a bankruptcy estate is the real party in interest for legal claims that are assets of a bankruptcy estate).  Consequently, the Sergent Claims are "counterclaims" because there is mutuality of parties.

The Plaintiff offers a second reason why the Sergent Claims do not fit within the statute: the Sergent Claims are not brought by Black Diamond's estate because the "estate ceases to exist" once the bankruptcy plan is confirmed.  Appellee's Br., *Sergent*, Pikeville No. 11-129-ART, R. 8 at 14 n.8.  This generalization is normally true in Chapter 11 reorganization bankruptcies because "the confirmation of a plan vests all of the property of the estate in the debtor" unless the plan says otherwise.  11 U.S.C. § 1141(b).  The empty estate then "ceases to exist," *Binder v. Price Waterhouse & Co.* (*In re Resorts Int'l, Inc.*), 372 F.3d 154, 165 (3d Cir. 2004), and the reorganized debtor returns to the "cold cruel business world," *Dyer v. First Nat'l Bank at Orlando* (*In re Seminole Park & Fairgrounds, Inc.*), 502 F.2d 1011, 1014 (5th Cir. 1974).

But things are not always so simple when a plan says otherwise in the liquidation context.  The Bankruptcy Code permits "the debtor, by the trustee, or by a representative of the estate" to prosecute the claims that are part of the debtor's estate.  11 U.S.C. § 1123(b)(3)(B) ("A plan may . . . provide for . . . the retention and enforcement by the debtor, by the trustee or by a representative of the estate appointed for such purpose, of [any claim or interest belonging to the debtor or to the estate].").  Often, like here, the

"representative of the estate" is a liquidating trustee. 6 Norton, <u>Bankruptcy Law and Practice</u> § 109:16. In this case, the Bankruptcy Court assigned the Sergent and A&M Claims to the BD Unsecured Creditors Trust, appointed the Plaintiff as a "representative of the estate," and charged her with liquidating those causes of action. Third Am. Joint Plan of Liquidation, *Underlying Bankruptcy*, R. 1562 Ex. A, art. IV.C ¶ 2 ("The BD Unsecured Creditors Trust shall be deemed not to be the same legal entity as any of the Debtors, but only [a] . . . *representative of their Estates for the pursuit of the Causes of Action assigned to the BD Unsecured Creditors Trust within the meaning of section 1123(b)(3) of the Bankruptcy Code.*") (emphasis added); *see also id.* art. IV.B ¶ 3(a) ("To the extent necessary or appropriate, the BD Unsecured Creditors Plaintiff may be designated as a representative of one or more of the Estates pursuant to section 1123(b)(3)(B) . . . to enforce or pursue any rights, claims or *Causes of Action that remain property of the Estates* after the Effective Date."). For the representative of an estate to bring claims post-confirmation, the estate must also still exist post-confirmation. Otherwise, the Plaintiff would represent nothing.

There is a second reason why Black Diamond's estate must continue to exist: Sergent still has Proofs of Claim pending against Black Diamond's estate. Sergent has filed Proofs of Claim to recover money from the estate. Nearly two years *after* confirmation, *see* Confirmation Order, *Underlying Bankruptcy*, R. 1562, the Bankruptcy Court held these Proofs of Claim in abeyance until the Sergent Claims and the A&M Claims are resolved, Abeyance Order, *id.*, R. 2052. Suppose that a court resolves the Sergent Claims and the A&M Claims, and after the Bankruptcy Court terminates the abeyance, the Bankruptcy Court rules in favor of Sergent on his Proofs of Claim. From whom will Sergent recover? From

18

Black Diamond's estate.  Yet if Black Diamond's estate no longer exists, the Bankruptcy Court would have denied Sergent's Proofs of Claim as moot, not held them in abeyance.

The scope of post-confirmation bankruptcy jurisdiction also compels the continued existence of Black Diamond's estate.  If a bankruptcy estate always ceased to exist once confirmation occurred, then there could be no related-to jurisdiction over post-confirmation litigation because there would be no estate to which the litigation can "relate."  6 Norton, Bankruptcy Law and Practice § 114:10; *cf. Boston Reg'l Med. Ctr. v. Reynolds* (*In re Boston Reg'l Med. Ctr.*), 410 F.3d 100, 105 (1st Cir. 2005) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)) (holding that related-to jurisdiction empowers courts to "deal efficiently and effectively with the entire universe of matters *connected with bankruptcy estates*") (emphasis added).  Yet "no court" has followed this logic to "its illogical conclusion."  *Id.*  Indeed, as the Court noted when this case was removed, the Bankruptcy Code specifically authorizes bankruptcy courts to "issue post-confirmation orders to help consummate the plan or administer the estate."  *Sergent*, 442 B.R. at 574 (citing *In re Resorts Int'l, Inc.*, 372 F.3d at 164).  And when a liquidating trustee is charged with administering the estate, the trustee "represents the estate by assuming the obligations to prosecute the instant claims for the benefit of unsecured creditors."  *Id.* at 575 (citing *Guttman v. Martin* (*In re Railworks Corp.*), 325 B.R. 709, 719 (Bankr. D. Md. 2005)).  Therefore, the estate in this case has not yet reached its expiration date.  *See also* Andrew M. Thau et al., *Postconfirmation Liquidation Vehicles (Including Liquidating Trusts and Postconfirmation Estates): An Overview*, 16 J. Bankr. L. & Prac. 2 art. 4, § III.B (2007) (discussing competing views of the relationship between the status of a Chapter 11 estate and post-confirmation liquidating trusts).  The Sergent Claims thus pass statutory muster.  *See Stern*, 131 S. Ct. at

2604 (holding that a claim was core within the meaning of the statute because it fell within the "plain text" of the illustrative list in § 157(b)(2)).

> ### (2)   *It is unconstitutional under* **Stern** *for the Bankruptcy Court to enter final judgment on the Sergent Claims.*

Although the Sergent Claims are core for purposes of the statute, they cannot constitutionally be treated as core.  In *Stern v. Marshall*, 131 S. Ct. 2594, the Supreme Court held that the Constitution limits Congress's ability to designate all counterclaims as core. There, a creditor filed a proof of claim against the debtor's estate alleging that the debtor had defamed the creditor.  *Id.* at 2601.  In response, the debtor filed a counterclaim in the bankruptcy court for the creditor's tortious interference with a gift that the debtor expected from her husband.  *Id.*  The bankruptcy court held that the debtor's counterclaim for tortious interference was a core proceeding because it was a "counterclaim by the estate against persons filing claims against the estate," and entered final judgment.  *See id.* at 2602.

The Supreme Court disagreed.  The counterclaim for tortious interference fit within the statutory examples of core proceedings in § 157(b)(2), but the Constitution prohibits a non-Article III court from entering final judgment on the counterclaim.  *Id.* at 2608.  Why? The Constitution prohibits a non-Article III court, such as a bankruptcy court, from exercising the "judicial Power of the United States."   U.S. Const. art. III, § 1, cl. 1. Exercising that power includes entering final judgment on a counterclaim that is a "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy."  *Stern*, 131 S.Ct. at 2611.  In *Stern*, even if the bankruptcy court ruled in the creditor's favor on the proof of claim for defamation, that court would have needed to decide additional questions to rule on the debtor's counterclaim

for tortious interference.  *See id.* at 2617–18.  Thus, the Court concluded that only an Article III court could enter final judgment on the counterclaim.

Will ruling on Sergent's Proofs of Claims necessarily resolve the Plaintiff's counterclaims for gross negligence and breach of fiduciary duty?  For both counterclaims, the answer is no.  Sergent's Proofs of Claim seek expectation damages for the commissions and royalties that he would have earned in the future had Black Diamond not entered bankruptcy and rejected the Consulting & Sales Agreement and Royalty Agreement. *Underlying Bankrutpcy*, R. 2008 Ex. B; *id.*, R. 2007 Ex. A.[1]  To decide whether to allow the Proofs of Claim, a court must determine whether Sergent is entitled to expectation damages under the state law governing the rejected agreements and whether the Bankruptcy Code otherwise disallows the claim.  *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co*, 549 U.S. 443, 452 (2007) (holding that proofs of claim enforceable under applicable state law are presumed to be allowed in bankruptcy "unless expressly disallowed by [11 U.S.C.] § 502(b)").  The Plaintiff gives three reasons for disallowing Sergent's Claims: (1) as claims for the "services of an insider of the debtor," Sergent's Proofs of Claim "exceed[] the reasonable value" of his services, *see* 11 U.S.C. § 502(b)(4); (2) Sergent's Proofs of Claim are subordinated to the claims of Black Diamond's more senior lenders, who have not yet been fully compensated, *see id.* § 510(a); and (3) that the Consulting & Sales Agreement and Royalty Agreement contain termination clauses that ended Sergent's rights to the commissions and royalties because Black Diamond's assets were transferred to another

---

[1] Sergent has also filed proofs of claim for loans he allegedly made to Black Diamond that were not repaid, *see* Claim Nos. 1257 & 1258, *Underlying Bankruptcy*, R. 2009 Ex. C, but Sergent does not argue that these proofs of claim are relevant to the constitutional question under *Stern*.

entity, *see id.* § 502(b)(1) (disallowing a proof of claim if it is otherwise unenforceable under applicable law).

Even assuming that the proofs of claim are disallowable on one of these three bases, a court could not enter judgment on either of the two Sergent Claims without deciding additional issues. On the Plaintiff's gross negligence claim, a court must determine if Sergent actually mismanaged Black Diamond, whether his mismanagement exhibited "malice or willfulness" beyond mere negligence, and the amount of any consequent losses to Black Diamond. *See, e.g., City of Middlesboro v. Brown*, 63 S.W.3d 179, 181 (Ky. 2001) (quoting *Cooper v. Barth*, 464 S.W.2d 233, 234 (Ky. 1971)). Because the Plaintiff seeks punitive damages for her gross negligence claim, a court also has to determine whether Sergent's mismanagement rises to the level of "wanton and reckless disregard for the lives, safety or property of others." *Peoples Bank of No. Ky., Inc. v. Crowe Chizek and Co. LLC*, 277 S.W.3d 255, 267–68 (Ky. App. 2008) (citing *Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51–52 (Ky. 2003)). Thus, ruling on the Proofs of Claim alone will not dispose of the gross negligence claim. *Accord Stern*, 131 S. Ct. at 2617–18 (concluding that ruling on a proof of claim would not necessarily resolve a counterclaim because ruling on the counterclaim required deciding the additional issue of punitive damages).

Nor does ruling on the Proofs of Claim necessarily resolve the breach of fiduciary duty claim. The Plaintiff alleges that Sergent self-dealt by appearing on both sides of a transaction. Compl., *McKinstry*, Pikeville No. 10-110-ART, R. 1-1 ¶ 54. To rule on this allegation, a court must determine: (1) whether Sergent was a fiduciary of Black Diamond; (2) whether he had personal financial interests in the Consulting & Sales Agreement and the Royalty Agreement; (3) whether the value of the commissions and royalties was reasonable

or otherwise fair; and (4) if liable, the amount of money Sergent self-dealt. *See, e.g., In re PNB Holding Co. Shareholders Litig.*, 2006 WL 2403999, at *12 (Del. Ch. Aug. 18, 2006); *see generally White v. Lunsford*, 2006 WL 2787469 (Ky. App. 2006) (borrowing Kentucky's law of officer and director liability from Delaware). Even then, Sergent is not liable unless his self-dealing "constitutes willful misconduct or wanton or reckless disregard for the best interests of the corporation and its shareholders"—more than mere negligence. Ky. Rev. Stat. § 271B.8-300(5)(b); *see also New Lexington Clinic, P.S.C. v. Cooper*, 2011 WL 6260442, at *4 (Ky. App. Dec. 16, 2011) (holding that Ky. Rev. Stat. § 271B.8-300 "applies in all circumstances where money damages are sought in a claim of breach of fiduciary duty against a corporate director").

Ruling on Sergent's Proofs of Claim and breach of fiduciary duty counterclaim, may, of course, involve some overlap in a court's decisionmaking. Sergent's Supp. Br., *Sergent*, Pikeville No. 11-129-ART, R. 26 at 8–10. But some overlap is not enough. *Stern*, 131 S. Ct. at 2617 (acknowledging that there was "some overlap" between the debtor's counterclaim and the creditor's proof of claim, but nonetheless holding that "there was never any reason to believe that the process of adjudicating [the creditor's] proof of claim would necessarily resolve [the debtor's] counterclaim"). The Bankruptcy Court does not have to decide whether Proofs of Claim exceed the reasonable value of Sergent's services as an insider because there are two other grounds on which the Proofs of Claim could be disallowed.

Even if a court were to disallow the Proofs of Claim because Sergent is an insider whose commissions and royalties were unreasonably valued, the Bankruptcy Court would still have to decide at least two additional issues to rule on the breach of fiduciary duty claim. First, the reasonableness inquiry is different. For the Proofs of Claim, the question is

whether the commissions and royalties that Sergent expected to receive in the *future* were reasonable in light of his services.  *See, e.g.*, *In re Delta Air Lines, Inc.*, 2010 WL 423279, at *8 (Banrk. S.D.N.Y. Feb. 3, 2010) (No. 05-17923) (holding that the "reasonable value" of future services under a rejected consulting agreement is "zero" because no future services could be provided and thus disallowing any claim for their value under § 502(b)(4)).  The breach of fiduciary duty claim, by contrast, requires considering whether the commissions and royalties that Sergent allegedly diverted to himself in the *past* were reasonable.

A court would also have to decide a second issue to rule on the breach of fiduciary duty claim: whether Sergent acted with "willful misconduct" in entering the Consulting & Sales Agreement and the Royalty Agreement.  This culpability determination plays no role in a court's allowance or disallowance of Sergent's Proofs of Claim.  For example, a court could conceivably disallow Sergent's Proofs of Claim because the value of his services was unreasonable and simultaneously find Sergent not liable for breach of fiduciary duty because his conduct was not willful or grossly negligent.  Consequently, ruling on Sergent's Proofs of Claim will not necessarily resolve either of the Sergent Claims for gross negligence and breach of fiduciary duty.  Therefore, it is unconstitutional to treat the Sergent Claims as core proceedings for the purpose of final adjudication.

## II.    <u>Sergent's Appeal</u>: The Bankruptcy Court Erred By Mandatorily Abstaining from the Sergent Claims.

The Court must reverse the Bankruptcy Court's decision to abstain from hearing the Sergent Claims.  Section 1334(c)(2) of Title 28 requires federal courts to abstain from

hearing non-core bankruptcy proceedings under certain conditions.[2]   Under the Sixth Circuit's test, a court must abstain from a claim that: (1) is based on a state law claim or cause or action; (2) has no federal jurisdictional basis other than the bankruptcy itself; (3) is commenced in a state forum of appropriate adjudication; (4) can be timely adjudicated in that state forum; and (5) is non-core.   *Lindsey v. Dow Chem. Corp.*, (*In re Dow Corning Corp.*), 113 F.3d 565, 570 (6th Cir. 1997) (citing *Lindsey v. O'Brien, Tanski, Tanzer & Young Health Care Providers of Conn.* (*In re Dow Corning*), 86 F.3d 482, 497 (6th Cir. 1996)). The first and third requirements are indisputably satisfied.  The Sergent Claims are based on state-law causes of action and began in an appropriate state forum.  Appellant's Br., *Sergent*, Pikeville No. 11-129-ART, R. 7 at 24; Appellee's Br., *id.*, R. 8 at 10.  The parties dispute the rest of the requirements.

Because the Court can exercise supplemental jurisdiction over the Sergent Claims, the five-part test for mandatory abstention is not satisfied.  The Plaintiff's complaint involves two sets of claims.  One—the core A&M Claims—is within this Court's original jurisdiction over core bankruptcy matters.  *See* 28 U.S.C. § 1334(a).  The other—the Sergent Claims— relates to the bankruptcy case.[3]   *See McKinstry*, 442 B.R. at 573.  The Sergent Claims are

---

[2] Section 1334(c)(1) also provides for permissive abstention under certain circumstances.  In bankruptcy court, the Trustee argued for both mandatory and permissive abstention from both the Sergent Claims and A&M Claims. Because the Bankruptcy Court mandatorily abstained from hearing the Sergent Claims, it did not decide whether it should permissively abstain from those claims.  Abstention Op., *Adversary Proceeding*, R. 26 at 16.  The Trustee has indicated that she does not renew her argument for permissive abstention if the Court withdraws the reference. Because the Court holds that withdrawal is eventually necessary, *see infra* Part III.B, this Court does not address permissive abstention of the Sergent Claims.  The Trustee is free to renew her argument for permissive abstention before the Bankruptcy Court.

[3] It is not clear whether the Sergent Claims are core or non-core under the mandatory abstention analysis.  Does the unconstitutionality of allowing the Bankruptcy Court to enter final judgment on the Sergent Claims under 28 U.S.C. § 157(b)(1) render them non-core for mandatory abstention under 28 U.S.C. § 1334(c)(2)?  This first question invites another: would Congress, had it anticipated *Stern*, have wanted to apply mandatory abstention to "unconstitutionally core" claims like the Sergent Claims?  *Compare In re Heller Ehrman LLP*, 2011 WL 4542512, at *3 (Bankr. N.D. Cal. Sept. 28, 2011) (equating "unconstitutionally core" claims with non-core claims) *with In re Blixseth*, 2011 WL 3274042, at *12 (Bankr. D. Mont. Aug. 1, 2011) (holding that "unconstitutionally core" claims

25

therefore part of the same case or controversy as "any civil action over which the district courts have original jurisdiction," 28 U.S.C. § 1367(a), which includes bankruptcy jurisdiction. *Edge Petroleum Operating Co. v. GPR Holdings, LLC* (*In re TXNB Internal Case*), 483 F.3d 292, 300 (5th Cir. 2007).

All of the parties agree that, if the A&M Claims are core, then the Court can exercise supplemental jurisdiction over the Sergent Claims. Mots. Hr'g Tr., *Sergent*, Pikeville No. 11-129-ART, R. 31 at 14 (Mr. Goodchild: "I think you—yes, I think you can exercise supplemental jurisdiction."); *id.* at 21 (The Court: "You agree, clearly from your briefs, that I have the ability to exercise supplemental jurisdiction?" Mr. Goroff: "Yes, Your Honor. The District Court plainly does."); *id.* at 25 (Mr. Goroff: "[The Sergent Claims] could be brought under supplemental jurisdiction in District Court, correct."); *id.* at 44 (Mr. Geller: "We believe the Bankruptcy Court erred by applying mandatory abstention in light of this Court's clear ability to exercise supplemental jurisdiction under [§] 1334(c)(2)."). Instead, the Plaintiff argues that mandatory abstention is proper because bankruptcy courts cannot exercise supplemental jurisdiction. Appellee's Br*., Sergent*, Pikeville No. 11-129-ART, R. 8 at 11–12.

The Plaintiff may be correct that bankruptcy courts cannot exercise supplemental jurisdiction. *See, e.g., Enron Corp. v. Citigroup, Inc.* (*In re Enron Corp.*), 353 B.R. 51, 59 (Bankr. S.D.N.Y. 2006). But she is answering the wrong question. Whether the *Bankruptcy Court* had an independent federal jurisdictional basis over the Sergent Claims is irrelevant to mandatory abstention because Section 1334(c) addresses when *district courts* should abstain.

---

are neither core nor non-core). The Court does not need to answer these difficult questions because as discussed below there is supplemental jurisdiction over the Sergent Claims. Therefore, even if they were "non-core" mandatory abstention does not apply.

The proper question, then, is whether the district court would have another source of federal jurisdiction over the Sergent Claims besides "related-to" bankruptcy jurisdiction under § 1334.  *See, e.g., In re TXNB Internal Case*, 483 F.3d at 300 (holding that bankruptcy courts may not exercise supplemental jurisdiction and upholding a denial of mandatory abstention because the *district court* could have exercised supplemental jurisdiction over the non-core proceeding).  Unsurprisingly, the Plaintiff has not identified any case that frames the question as whether the bankruptcy court had another basis for federal jurisdiction over the claims.  Because this Court can exercise supplemental jurisdiction over the Sergent Claims, the Court does not need to wade into the parties' tempest over whether the state court can adjudicate the Sergent Claims in a timely fashion.  The Bankruptcy Court was not required to abstain from hearing the Sergent Claims.

## III.   <u>The Plaintiff's Motion to Withdraw</u>: There Is Cause To Withdraw the Reference, But Doing So Is Premature.

Because mandatory abstention does not apply, the Sergent Claims remain in Bankruptcy Court.  Consequently, the Court must evaluate the Plaintiff's motion to withdraw with respect to both the A&M Claims and the Sergent Claims.

District courts have discretion to withdraw "in whole or in part, any case or proceeding" referred to the bankruptcy court "for cause shown."  28 U.S.C. § 157(d); *Steed v. Knox Forex Group, LLC* (*In re Rivas*), 2009 WL 2929424, at *1 (E.D. Tenn. Sept. 8, 2009).  The Bankruptcy Code does not define "cause."  Courts determine whether cause exists by balancing the following factors: (1) whether the right to a jury trial exists; (2) whether the matter is core or non-core; (3) promoting judicial economy; (4) promoting uniformity in bankruptcy administration; (5) reducing forum shopping and confusion; (6)

conserving the creditor's and debtor's resources; and (7) expediting the bankruptcy process. *See, e.g., In re Rivas*, 2009 WL 2929424, at *2; *In re Orion Pictures Corp.*, 4 F.3d at 1101; *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985); *CIT Grp./Commercial Servs., Inc. v. Constellation Energy Commodities Grp., Inc.* (*In re Black Diamond Mining Co.*), 2010 WL 5173271, at *1 (E.D. Ky. Dec. 14, 2010) (listing these as six factors instead of seven, but separately emphasizing the importance of a determining whether the claim is core) (citing *Big Rivers Elec. Corp.* 182 B.R. at 754).   As the party seeking withdrawal, the Plaintiff has the burden of proving that the Court should withdraw the reference.   *In re Black Diamond Mining Co.*, 2010 WL 5173271, at *1 (citing *Holland v. LTV Steel Co., Inc.*, 288 B.R. 770, 773 (N.D. Ohio 2002)).

Here, the Plaintiff has met that burden, but her timing is premature.   Because the Plaintiff has a jury trial right on all of her causes of action, cause to withdraw the reference "automatically exists" regardless of the remaining factors.   *E.g., Caudill v. Burrows* (*In re Oasis Corp.*), 2008 WL 2473496, at *2 (S.D. Ohio June 18, 2008) (No. C2-08-00288). Significant pretrial matters, however, remain unfinished.   Therefore, the Court denies the Plaintiff's motion to withdraw the reference without prejudice until the case is trial-ready.

### A.      The Plaintiff has a right to a jury trial on all of her causes of action.

The plaintiff is entitled to a jury trial on both the Sergent Claims and the A&M Claims.   Under the Seventh Amendment of the United States Constitution, the right to a jury trial "shall be preserved" in "Suits at common law."   A litigant is entitled to a jury trial only on issues that resolve legal rights rather than equitable ones.   *Bledsoe v. Emery Worldwide Airlines, Inc.*, 635 F.3d 836, 841 (6th Cir. 2011) (citing *Wooddell v. Int'l Bhd. Of Elec. Wkrs., Local 71*, 502 U.S. 93, 97 (1991)).   Whether an action involves legal or equitable

rights, in turn, depends upon a two-part inquiry into the nature of the cause of action and the nature of the remedy sought (the "*Granfinanciera* test"). *See generally Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). The Court must (1) compare the nature of the claim to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity," and (2) evaluate the remedy that the Plaintiff seeks to "determine whether it is legal or equitable in nature." *Id.* (quoting *Chauffeurs, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990)). The second inquiry is "more important" in this analysis. *Id.* (quoting *Terry*, 494 U.S. at 565).

### *(1)*    *The Plaintiff has the right to a jury trial on the Sergent Claims.*

The Plaintiff alleges two theories of liability against Sergent: First, Sergent engaged in unlawful self-dealing by causing Black Diamond to pay him commissions and royalties on the coal it sold, and this alleged breach of fiduciary duty led to the company's losses and eventual downfall. Compl., *McKinstry*, Pikeville No. 10-110-ART, R. 1-1 at 24 ¶¶ 53–55 (Count I). Second, Sergent mismanaged Black Diamond by causing the company to rely on the spot market to satisfy its long-term Supply Contracts, and these grossly negligent decisions led to the company's losses and eventual downfall. *Id.* at 25 ¶¶ 56–59 (Count II). The Plaintiff is entitled to a jury trial on both claims.

Getting to this conclusion, however, requires "rattling through dusty attics of ancient writs." *Terry*, 494 U.S. at 575 (1990) (Brennan, J., concurring in part and concurring in the judgment). Historically, a corporation could hold its officers and directors liable for mismanaging its affairs by suing them in courts of equity for breach of fiduciary duty. *See, e.g.*, *The Charitable Corp. v. Sutton*, (1742) 26 Eng. Rep. 642 (Ch.) 644–45 (the first reported case in which a court of equity held "committee-men," or directors of a corporation,

liable for breach of trust); *Overend, Gurney & Co. v. Gurney* (1869) 4 L.R. 701 (Ch.App.) (a seminal English court of equity case involving claims against directors of a corporation, for breach of trust, fraud, and mismanagement); P.D. Finn, <u>Fiduciary Obligations</u> 1 (1977) (noting that fiduciary duties developed in courts of equity); L.S. Sealy, *Fiduciary Relationships*, 1962 Cambridge L.J. 69, 69–72 (summarizing the historical development of "breach of confidence" claims against trustees, corporate directors, and other fiduciaries in English courts of equity).

But this oft-repeated story does not tell the whole tale of officer and director liability. While courts of equity were busy enforcing directors' fiduciary duties as quasi-trustees, courts of law treated directors as quasi-agents of the corporation. 3 John Norton Pomeroy, <u>Equity Jurisprudence and Equitable Remedies</u> § 1089 (1905) (discussing the "rights, duties, and liabilities" that resulted from the directors' simultaneous status as quasi-agents and quasi-trustees). Corporations thus had two options for pursuing claims of director liability: an "action on the case at law to recover damages" or a "suit in equity to compel them to account." William L. Clark, Jr., <u>Handbook on the Law of Private Corporations</u> ch. XIII § 204 (1916). This concurrent jurisdiction over officer and director liability is unsurprising. There was a "continual process of borrowing by one jurisdiction from the other," which was "not accompanied by an equivalent sloughing off of functions." Fleming James, Jr., <u>Right to a Jury Trial in Civil Actions</u>, 72 Yale L.J. 655, 658–59 (1963); *see also id.* at 692 ("[I]ssues are not inherently legal or equitable. They are like chameleons which take their color from surrounding circumstances.").

Because of these parallel theories of director and officer liability, a corporation like Black Diamond would have been able to sue Sergent for his alleged mismanagement in

either law under negligence or equity under breach of fiduciary duty.  Therefore, the first

step of the *Granfinanciera* test shows that Black Diamond's gross negligence action against

Sergent was historically an action at law, while its breach of fiduciary duty claim was

equitable.

This preliminary conclusion invites the second, more important step of the

*Granfinanciera* test: when is money a legal remedy and when it is equitable?  After all,

money is the "traditional form of relief offered in the courts of law," but it is not always a

legal remedy.  *Terry*, 494 U.S. at 570 (quoting *Curtis v. Loether*, 415 U.S. 189, 196 (1974)).

A monetary remedy is equitable only when it is a form of equitable restitution or it is

"incidental to or intertwined with injunctive relief."  *Id.* at 571 (quoting *Tull v. United States*,

481 U.S. 412, 424 (1987)).  Because the Plaintiff has not asked for injunctive relief, the only

question is whether the monetary remedy she seeks for the Sergent Claims is a form of

equitable restitution.  It is not.  For both claims, the Plaintiff seeks compensatory damages

for the losses that Black Diamond sustained—the quintessential form of legal relief.  *Leary v.*

*Daeschner*, 349 F.3d 888, 910 (6th Cir. 2003) (quoting *Hildebrand v. Bd. of Tr. of Mich.*

*State Univ.*, 607 F.2d 705, 708 (6th Cir. 1979) ("In the ordinary case, if the relief sought

includes compensatory and/or punitive damages, then there does exist a right to trial by

jury."); *accord Pereira v. Farace*, 413 F.3d 330, 340–41 (2d Cir. 2005) (holding that a

breach of fiduciary duty claim for compensatory damages entitled the plaintiff to a jury trial).

Moreover, the money Plaintiff seeks is not from specific funds or property in Sergent's

possession.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, at 213 (2002)

(holding that a monetary remedy is equitable either when the money sought by the plaintiff is

clearly traceable to funds in the defendant's possession or when it is awarded incidentally to injunctive relief).

To sum up:  Both steps of the *Granfinanciera* test support the right to a jury trial for the gross negligence claim (Count II).  With respect to the breach of fiduciary duty claim (Count I), the first and second steps of the *Granfinanciera* test point in opposite directions, but the legal nature of the remedy—the second step—breaks the tie.

At least one other court in this circuit disagrees with this latter conclusion, holding that a breach of fiduciary duty claim is historically equitable and thus never carries a jury trial right.  *See Official Comm. of Unsecured Creditors v. Hendricks*, No. 04-066-MRM, 2008 WL 5428012, at *3–4 (S.D. Ohio Oct. 2, 2008).  This analysis, however, is only the first step of the *Granfinanciera* inquiry.  The remainder of the *Hendricks* analysis suffers from two fatal defects.  First, it "conflates the two parts" of the *Granfinanciera* inquiry by assuming that an equitable cause of action for breach of fiduciary duty necessarily entails an equitable remedy.  *Terry*, 494 U.S. at 571 n.8 ("The second part of the analysis, therefore, should not replicate the 'abstruse historical' inquiry of the first part, but requires *consideration of the general types of relief provided by courts of law and equity*." (emphasis added) (quoting *Ross*, 396 U.S. at 538 n.10 (1970)).  Second, the *Hendricks* court failed to explain why the monetary relief sought in that case was not a legal remedy entitling the plaintiff to a jury trial.  Instead, the court concluded that there was no jury trial right because "other kinds of [equitable] relief"—which the plaintiff did not seek—would have been available to rectify the breach of fiduciary duty.  *Id.*  But the rule cannot be that the availability of equitable relief not sought by a litigant eviscerates a litigant's jury trial right for the legal relief he actually seeks.  If this were the rule—and the *Hendricks* court cites no

authority to suggest that it is, *see id.* at *4—then a litigant would only have the right to a jury trial on claims for which legal relief is the only relief available.  In fact, the Supreme Court has said the exact opposite.  *E.g., Tull*, 481 U.S. at 417 ("[T]he Court must examine both the nature of the action and the remedy *sought*.") (emphasis added); *accord Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446–47 (1830) (Story, J.) (holding that the Seventh Amendment preserves the right to a jury trial in "not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered"); *see also Curtis*, 415 U.S. at 190–91 (holding that a statutory damages for actions carried the right to a jury trial, even though the plaintiff had been previously awarded injunctive relief under the same statute).

Consider the following scenario: A corporation sues its officer for mismanagement back in the days of the divided bench.  If the corporation was trying to recover profits that the officer gained through his misconduct and that were still in his possession, then the corporation had to bring a bill in equity for breach of fiduciary duty and seek an accounting of the profits.  If the corporation was successful, the court of equity would determine the amount of the unjustly gained profits and hand title of the defendant's profits over to their true owner, the corporation.  By contrast, if the corporation sought to recover losses caused by the officer's misconduct that were not traceable to any particular funds in his possession, then the corporation had to bring a negligence action in a court of law.[4]  A jury would

---

[4] In addition to awarding the amount of the defendant's unjust enrichment, courts of equity sometimes awarded incidental damages for breaches of fiduciary duty.  *See* Joyce, <u>Actions By and Against Corporations at Law and in Equity</u> § 262.  Courts of equity engaged in this practice, however, as part of the equitable clean-up doctrine, not because incidental damages were a form of equitable relief.  The equitable clean-up doctrine was a doctrine of procedural efficiency.  It gave courts of equity discretion to award legal relief that was incidental to any equitable

determine the amount of damages, and the court would grant the plaintiff a judgment as a creditor. *Great-West Life*, 534 U.S. at 213; *see also* Joseph Asbury Joyce, <u>Actions By and Against Corporations at Law and in Equity</u> § 262 (1910) ("But a corporation may sue one or more of its directors in equity for an accounting with respect to property of the corporation which has actually come into his or their hands, or for fraudulent breach of trust in the management of the corporation or its property and for the recovery of the value of the property lost . . . . So, too, it has an action at law against one or more directors for damages sustained by the corporation in consequence of his or their wrongful, negligent official acts of misfeasance or nonfeasance."); *People v. Equitable Life Assur. Soc'y*, 109 N.Y.S. 453, 468 (N.Y. App. Div. 1908) ("A corporation may have a cause of action *in equity* against one or more directors for an accounting with respect to property of the corporation that has actually come into his or their hands, or for a fraudulent breach of trust with respect to the management of the corporation or its property, and for the recovery of the value of property lost . . . . It may also have one or more causes of action *at law* against one or more directors *for damages* sustained by the corporation in consequence of his or their wrongful or negligent official acts falling within the terms 'misfeasance' or 'nonfeasance.'") (emphasis added) (internal citations omitted); 4 William Meade Fletcher, <u>Cyclopedia of the Law of Private Corporations</u> § 2670 (1918) (similar). The Seventh Amendment preserves this divide today, and consequently, the Plaintiff is entitled to have a jury hear the Sergent Claims because both claims seek legal remedies.

---

relief to avoid forcing the plaintiff to bring separate actions in law and in equity to recover his full losses. *See, e.g.*, 1 John Norton Pomeroy <u>A Treatise on Equity Jurisprudence</u> § 236–41 (1881); *see also Wright v. Scotton*, 121 A. 69, 74 (Del. Ch. 1923) (internal citations omitted) (explaining the purpose behind the equitable clean-up doctrine); *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442–43 (7th Cir. 1984) (discussing limitations on the equitable clean-up doctrine). Therefore, this practice of awarding incidental damages does not change the fact that compensatory money damages were generally a form of legal relief.

### (2) The Plaintiff has the right to a jury trial on the claims against Genser and Tate.

The Plaintiff also has a right to a jury trial on all of the A&M Claims.  Before reaching the first step of the *Granfinanciera* inquiry, however, a threshold question lingers: what cause of action does the Plaintiff allege against Genser and Tate?  The complaint calls it "willful misconduct and gross negligence"—the same title as one of the allegations against Sergent.  Compl., *McKinstry*, Pikeville No. 10-110-ART, R. 1-1 at 26–27 ¶¶ 66–73 (Counts IV and V).  But the "constitutional right to trial by jury cannot be made to depend on the choice of words used in the pleadings."  *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477–78 (1962).

The Plaintiff describes her cause of action as gross negligence against officers of a company for the lost value of Black Diamond's estate and correspondingly claims the right to a jury trial.  *See generally* Pl.'s Supp. Br. on Jury Trial Issue, *McKinstry*, Pikeville No. 11-133-ART, R. 22.  The A&M Defendants describe the action as breach of fiduciary duty against the functional equivalent of a trustee for a surcharge, to which they claim that there is no jury trial right.  *See generally* A&M's Supp. Br. Jury Trial Issue, *id.*, R. 19.

Neither party is quite right.  Under the first step of *Granfinanciera*, the nature of the action—breach of the officers' fiduciary duty to maximize the value of the estate—is historically equitable.  To understand why, a quick bankruptcy primer is necessary.  When a bankruptcy case commences, the Bankruptcy Code creates an estate to hold broad swaths of the debtor's property.  11 U.S.C. § 541(a).  To ensure that the property in the estate is optimally used to reorganize or liquidate the debtor (depending on the aim of the bankruptcy), someone has to represent the interests of the estate.  The Bankruptcy Code

provides two possible representatives: either a disinterested, court-supervised trustee, *id.* § 323(a), or the debtor in possession itself, *id.* § 1107(a). If a trustee is appointed, then the trustee owes a fiduciary duty to "maximize the value of the estate" for all of its creditors. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985). But when no trustee is appointed—like here—the debtor corporation "bears essentially the same fiduciary obligation" to maximize value for the creditors. Naturally, these fiduciary duties fall upon the debtor's officers, like Genser and Tate. *Wolf v. Weinstein*, 372 U.S. 633, 649–50 (1963). In short, a bankruptcy court's "willingness to leave the Debtor in possession is premised upon an assurance" that the debtor's officers will carry out the trustee's fiduciary duties. *Id.* at 651.

Here, the Plaintiff alleges that Genser and Tate failed to capitalize on various opportunities to lock in profitable, long-term contracts and did not sell any coal while running Black Diamond. Compl., *McKinstry*, 442 B.R. 567 (Pikeville No. 10-110-ART), R. 1-1 at 16–22 ¶¶ 32–47. Instead, Genser and Tate supposedly followed the preference of CIT Capital and the other lenders for a "quick sale" of Black Diamond to the detriment of the estate's other creditors. *Id.* at 23–24 ¶ 52. In other words, the Plaintiff alleges that Genser and Tate only tried to benefit one constituency of creditors—the lenders—and therefore did not maximize the value of the estate for *all* of the creditors. These allegations amount to a breach of fiduciary duty. *See id.* at 16 ¶ 33 (alleging that the A&M Defendants had "a fiduciary duty to maximize the value of [Black Diamond] for *all* creditors and equity holders, not just for the Lenders").

The Plaintiff may be correct that individual instances of Genser and Tate's mismanagement could be described in terms of gross negligence or willful misconduct. Pl.'s

36

Supp. Br., *McKinstry*, Pikeville No. 11-133-ART, R. 23 at 8–9.   But there are two reasons why the Plaintiff's allegations nonetheless constitute equitable claims for breach of fiduciary duty rather than legal claims for gross negligence.   First, the complaint itself alleges that Genser and Tate breached their fiduciary duty to maximize the recovery to all of the estate's creditors.   *See, e.g.,* Compl., 442 B.R. 567 (Pikeville No. 10-110-ART), R. 1-1 at 16 ¶ 32 ("Because of CIT's close relationship with A&M  and the fact that A&M owed its position in the case to CIT, A&M, Genser and Tate became locked on CIT's goal of a quick sale of the Company to the exclusion of all other alternatives . . . ."); *id.* at 16 ¶ 33 ("A&M, Genser and Tate had no right to follow only the instructions and preferences of the Lenders, which had directed that A&M be retained for Black Diamond's bankruptcy."); *id.* at 16–17 ¶ 34 ("[The A&M Defendants'] stubborn adherence to the preference of the Lenders for a quick sale of the Company resulted in a willful disregard and reckless indifference to carrying out the most basic of tasks that would have produced a significantly higher recovery to all creditors and other stakeholders.").   Second, the Plaintiff's approach would convert nearly all equitable breach of fiduciary duty claims into legal actions for gross negligence.   This approach is not consistent with how courts have historically drawn the line between law and equity.   Courts of equity did not lose jurisdiction over breach of fiduciary duty claims merely because a plaintiff alleged that a fiduciary was grossly negligent in some respect.   Some grossly negligent act or other willful misconduct formed the basis for the breach of fiduciary duty claim in the first place.   *See supra* Part III.A(1) (discussing history of officer and director liability).   Therefore, under the first step of the *Granfinanciera* inquiry, the complaint alleges an equitable breach of fiduciary duty claim against two officers of a debtor corporation for money damages.

But the A&M Defendants' victory on the first step is short-lived because the second step of the inquiry reveals that the Plaintiff seeks a legal remedy: compensatory damages. Recall the reasoning applied to the Sergent Claims. Money is the "traditional form of relief offered in the courts of law." *Terry*, 494 U.S. at 570 (quoting *Loether*, 415 U.S. at 196). It is only an equitable remedy in two circumstances: when the plaintiff seeks equitable restitution of property or funds in the defendant's possession or when the money is "incidental to or intertwined with injunctive relief." *Id.* at 570–71 (quoting *Tull*, 481 U.S at 424).

In response, the A&M Defendants propose a third circumstance in which money is an exclusively equitable remedy: an action for "surcharge" against a breaching fiduciary, which requires him to "make the estate whole" by paying money. A&M's Supp. Br. on Jury Trial Issue, *McKinstry*, Pikeville No. 11-133-ART, R. 22 at 5 (citing *Robbins v. Schuyler* (*In re United Equip. Sales Co.*), 47 B.R. 818, 821 (Bankr. W.D. Mich. 1985), and *Ellis v. Rycenga Homes, Inc.*, 2007 WL 1032367, at *2–3 (W.D. Mich. 2007)). A surcharge is not an equitable action itself, but instead is a remedy "only available as part of an accounting." Susan Harthill, *A Square Peg in a Round Hole: Whether Traditional Trust Law "Make-Whole" Relief Is Available Under ERISA Section 502(A)(3)*, 61 Okla. L. Rev. 721, 751 (2009); E. Daniel Robinson, *Embracing Equity: A New Remedy for Wrongful Health Insurance Denials*, 90 Minn. L. Rev. 1447, 1469–70 (2006). An accounting, in turn, is an equitable mechanism requiring a trustee to account for "receipts, disbursements, and property on hand." Harthill, *supra*, at 751 (quoting George G. Bogert & George T. Bogert, <u>Law of Trusts & Trustees</u> § 963 (2d ed. 1982)). The A&M Defendants argue that the exclusively equitable remedy of surcharge was available against not just trustees, but all fiduciaries, including corporate officers like themselves.

But history, logic, and law do not support this argument.  First, it is not clear that a surcharge is the equivalent of compensatory damages.  The authorities are split on this issue. *See* Harthill, *supra*, at 771 (describing how "none of [the relevant treatises] address whether equity attached any particular conditions" to make-whole relief and the surcharge remedy). At least some authorities, however, indicate that the measure of a surcharge was limited to the defendant's unjust gain—not any consequent losses to the plaintiff.  *Compare, e.g.,* 1 Dan B. Dobbs, Law of Remedies § 4.3(5) (2d ed. 1993) (describing an accounting and surcharge as being limited to the defendant's unjust profits) *and* Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L.J. 463, 485 (1985) (similar) *with* Harthill, *A Square Peg in a Round Hole*, 61 Okla. L. Rev. at 769 (quoting 1 Pomeroy, Equity Jurisprudence and Equitable Remedies § 158) (explaining that whether monetary relief for breach of trust was available in law or equity depended on "the nature and object of the trust" and the type of breach).  *But see* Bogert & Bogert, The Law of Trusts and Trustees § 971 (indicating that a surcharge could include both the defendant's unjust profits and any consequent losses to the plaintiff).  These same authorities also indicate that an award of monetary relief for a plaintiff's losses sometimes accompanied a surcharge under the equitable clean-up doctrine, which permitted courts of equity to award incidental legal relief for reasons of procedural efficiency.  *See supra* p. 33 note 3 (explaining the equitable clean-up doctrine).  Even if compensatory relief for losses accompanied a restitutionary surcharge, this practice simply reflects the equitable clean-up doctrine at work and does not necessarily indicate that the compensatory aspect was equitable.

Second, even if a surcharge against a fiduciary is compensatory just like money damages, history makes clear that compensatory relief in the form of money was also

available in courts of law against corporate officers and directors for their mismanagement of a corporation. *See supra* Part III.A(1). Because historically there was concurrent equitable and legal jurisdiction over compensatory money damages against a corporate director, *see id.*, the Plaintiff retains her right to have a jury determine the amount of damages.

Third, the A&M Defendants assume that if the Trustee's cause of action is an equitable one for breach of fiduciary duty, then the remedy she seeks *must* be an equitable accounting. A&M's Br. in Resp., *McKinstry*, Pikeville No. 11-133-ART, R. 4 at 28–29. But the Supreme Court has expressly foreclosed this argument because it "conflates the two parts" of the *Granfinanciera* inquiry and would render moot the "more important" analysis of the remedy sought. *Terry*, 494 U.S. at 571 n.8 ("The second part of the analysis, therefore, should not replicate the 'abstruse historical' inquiry of the first part, but requires *consideration of the general types of relief provided by courts of law and equity*." (emphasis added) (quoting *Ross v. Bernhard*, 396 U.S. 531, 538 n.10 (1970))). Here, the Plaintiff has not asked for anything resembling an accounting of the estate's property, and so a surcharge would not be available on the facts of this case.

Even if a surcharge against corporate officers was an equitable form of compensatory relief, accepting this argument would blur the categorical distinctions that the Supreme Court has imposed on the law-equity divide. In the Seventh Amendment context, the Supreme Court has held monetary relief to be equitable in only two circumstances: equitable restitution or a money awarded "incidental to or intertwined with injunctive relief." *Id.* at 570–71 (quoting *Tull*, 481 U.S. at 424). In the context of determining what constitutes "equitable relief" in the Employee Retirement Income Security Act, the Supreme Court has also hewed to these rule-like categories. There, the only forms of compensatory damages it

40

recognizes as equitable are equitable restitution and an accounting for profits—neither of which is compensatory. *Great-West*, 534 U.S. at 234.

To be sure, *Great-West* is "not a Seventh Amendment case." *Reese v. CNH America LLC*, 574 F.3d 315, 328 (6th Cir. 2009). But its discussion of when money is an equitable remedy for ERISA extends to the Seventh Amendment context because both rely on the same two-step inquiry. *Great-West*, 534 U.S. at 716 ("[The law-equity inquiry] is an inquiry, moreover, that we are accustomed to pursuing, and will always have to pursue in other contexts," such as determining the "scope of the Seventh Amendment right to jury trial."). Indeed, the Supreme Court has relied on its Seventh Amendment discussions of law and equity when deciding the scope of "equitable relief" under ERISA. *See, e.g., Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993) (relying on two Seventh Amendment cases, *Curtis*, 415 U.S. at 196, and *Terry*, 494 U.S. at 570)). And other courts have recognized that the Supreme Court's discussion of equitable remedies in the ERISA context extends to the Seventh Amendment context. *See, e.g., Dexis Credit Local v. Rogan*, 629 F.3d 612, 626 (7th Cir. 2010); *Braunstein v. McCabe*, 571 F.3d 108, 120 (1st Cir. 2009); *Pereira v. Farace*, 413 F.3d 330, 340–41 (2d Cir. 2005); *Chao v. Meixner*, No. 1:07-cv-0595-WSD, 2007 WL 4225069, at *5 (N.D. Ga. Nov. 27, 2007); *see also Pereira*, 413 F.3d at 346 (Newman, J., concurring). Compensatory damages against corporate officers must thus remain a form of legal relief.

Genser and Tate try to avoid this conclusion by shoehorning themselves into the trustee box, claiming that they are the "functional equivalent[s]" of trustees. Before the merger of law and equity, they argue, courts of equity had exclusive jurisdiction over trusts. Accordingly, any remedy sought against a trustee or its functional equivalent is exclusively

equitable.   They therefore contend that the monetary relief sought against them must be exclusively equitable, and no jury trial right attaches.

Genser and Tate may be right about the history, but they are wrong about the analogy. They are correct that only a court of equity could grant compensatory relief against a trustee in the form of a surcharge.  *Cigna Corp. v. Amara*, 563 U.S. ___, 131 S. Ct. 1866, 1880 (2011) (citing *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 464 (1939)) (in dicta); *id.* at 1884 (Scalia, J., concurring) (recognizing that the majority's discussion of surcharge was "purely dicta"); *see also Terry*, 494 U.S. at 571 n.8 (noting that damages awarded to beneficiaries for a trustee's breach of trust "were available only in courts of equity because those courts had exclusive jurisdiction over actions involving a trustee's breach of his fiduciary duties"); Third Restatement of Trusts § 95 cmt. b ("If a breach of trust causes a loss, including any failure to realize income, capital gain, or appreciation that would have resulted from proper administration, the beneficiaries are entitled to restitution and may have the trustee surcharged for the amount necessary to compensate fully for the consequences of the breach."); Bogert & Bogert, The Law of Trusts and Trustees § 862 ("For a breach of trust the trustee may be directed by the court to pay damages to the beneficiary out of the trustee's own funds, either in a suit brought for that purpose or on an accounting where the trustee is surcharged beyond the amount of his admitted liability.").   But this observation should come as no surprise.  Trusts were within the exclusive province of the courts of equity because courts of law refused to recognize them at all.  *SEC v. Cavanagh*, 445 F.3d 105, 118–19 (2d Cir. 2006) (citing 3 William Blackstone, *Commentaries on the Laws of England* 431 (photo. reprint 1992) (1768)); *id.* at 119 n.31 (citing Stewart E. Sterk, *Asset Protection Trusts: Trust Law's Race to the Bottom?*, 85 Cornell L. Rev. 1035, 1040–42

(2000)); *see also* Blackstone, *Commentaries*, 431–32 ("[A] technical trust indeed, created by the limitation of a second use, was forced into a court of equity . . . [and] ha[s] ever since remained as a kind of *peculium* in those courts."). Therefore, all remedies against a breaching trustee could be classified as equitable.

But Genser and Tate are not sufficiently analogous to trustees. The question is this: do Genser and Tate trace their authority, and thus the basis for their liability, to the equitable powers of the Bankruptcy Court to appoint and oversee trustees and other court officers? *Accord Yadkin Valley Bank & Trust Co. v. McGee* (*In re Hutchinson*), 5 F.3d 750, 757–58 (4th Cir. 1993) (reasoning that bankruptcy trustees trace their authority to the powers of courts of equity that supervised their actions, thus concluding that claims against them are akin to equitable claims for breach of trust).

They do not. Genser and Tate are correct that the Bankruptcy Court authorized Black Diamond to hire Genser as CRO, who then hired Tate as CFO. *See* CRO Order, *Underlying Bankruptcy*, R. 56 at 2–3. But they derive their powers primarily from their employment as corporate officers and not from the Bankruptcy Court's power to supervise over Chapter 11 trustees and other court officers:

- The scope of their services and compensation was explicitly defined in the Engagement Letter, much like any officer hired by a corporation. Engagement Letter, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 at 1 (setting forth the relationship between A&M and Black Diamond, "including the scope of the services to be performed and the basis of compensation for those services").

- A Chapter 11 trustee must be "one disinterested person," 11 U.S.C. § 1104(b)(1), but Genser could hire other individuals to help run Black Diamond. Engagement Letter, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 ¶ 1.a(iii). He could do so without the Bankruptcy Court's further approval. *Cf.* 11 U.S.C. § 1104(a) (requiring the Bankruptcy Court to give notice and conduct a hearing before appointing a trustee).

- Unlike a trustee, the Bankruptcy Court did not require Genser, Tate, and any additional management to be "disinterested." Mem. Op., *Adversary Proceeding*, R. 144 at 5 ("The Court agrees with the A&M Parties that their *retention as officers of the Debtors did not implicate the principles of disinterestedness*.") (emphasis added); *cf.* 11 U.S.C. § 1104(b)(1) (requiring the trustee to be disinterested); *id.* § 101(14) (defining "disinterested person").  If the Bankruptcy Court had required them to satisfy the disinterested requirement, they could not have done so.  *See In re Palm Coast, Matanza Shores Ltd.*, 101 F.3d 253, 258 (2d Cir. 1996) ("A trustee who hires his own professional firm to assist him cannot be a 'disinterested person' who has no interest adverse to the estate."); Pl.'s Supp. Br. on Jury Trial Issue, Pikeville No. 11-133-ART, R. 22 at 3 (noting that the A&M Defendants would not have been disinterested because "A&M received a preferential payment of more than $272,000 on the eve of [Black Diamond's] bankruptcy").

- Genser and Tate did not have to apply to the Bankruptcy Court to have their compensation approved, and their fees were not subject to the Bankruptcy Court's detailed review and approval after notice and a hearing.  *Cf.* 11 U.S.C. § 330 (requiring the Bankruptcy Court to determine the "amount of reasonable compensation to be awarded to an examiner, trustee under Chapter 11, or professional person" based on an enumerated list of factors).

- A&M could substitute Steven Cohn, another A&M employee, for Genser as CRO at A&M's discretion and without the Bankruptcy Court's approval.  CRO Order, *Underlying Bankruptcy*, R. 56 at 2; *cf.* 11 U.S.C. § 1104(d) (requiring the Bankruptcy Court to approve a trustee's replacement if the original trustee fails to qualify, dies, resigns, or is removed).

- Genser and Tate could terminate their employment for any reason and without the Bankruptcy Court's approval by giving thirty days' notice to Black Diamond.  Engagement Letter, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 ¶ 3.  They did not derive this thirty-day termination right from any part of the Bankruptcy Code or any order of the Bankruptcy Court, but from their Engagement Letter with Black Diamond.  *Id.* Moreover, this termination right was a two-way street: Black Diamond could also terminate Genser and Tate's employment upon thirty days' notice.  The Bankruptcy Code neither permits a debtor in possession to fire its appointed trustee without court approval nor permits a trustee to terminate his appointment without court approval.  *Cf.* 11 U.S.C. § 1105 (requiring bankruptcy courts to give notice and hold a hearing before approving the termination of a trustee's appointment).

- ▪ Bankruptcy trustees and court-appointed officers who represent the estate are entitled to absolute quasi-judicial immunity for actions "within the scope of the authority conferred upon [them] by statute or the court." *Harris v. Wittman* (*In re Harris*), 590 F.3d 730, 742 (9th Cir. 2009) (quoting *Read v. Duck* (*In re Jacksen*), 105 B.R. 542, 545 (9th Cir. B.A.P. 1989)).  Here, however, the Bankruptcy Court determined that the A&M Defendants are not entitled to quasi-judicial immunity for any of the A&M Claims.  Mem. Op., *Adversary Proceeding*, R. 144 at 4–5.

Genser did have many of the powers necessary to run Black Diamond during its bankruptcy.  But the hybrid nature of Genser's CRO position actually undermines any analogy to a trustee.  His powers, although coincident with a trustee's powers, were the same as those of any corporate officer to run his company.  Indeed, the Bankruptcy Code does not include any provision for the position of CRO.  Other than the parties' consent, the Bankruptcy Court did not expressly rely upon any part of the Bankruptcy Code—the only source of its judicial powers—to create the CRO position.  Because Genser's CRO position lacks any of the Code's limitations on trustees or professional persons, this judicial reprogramming of the Bankruptcy Code is hardly an invocation of the Code's specifically enumerated equitable powers.  *See, e.g., In re SunCruz Casinos, LLC*, 298 B.R. 821, 832 (Bankr. S.D. Fla. 2003) (holding that if a debtor's management needs to be replaced, the Bankruptcy Code provides for the appointment of a trustee but does not contemplate the appointment of a restructuring officer to perform the duties of a trustee); *In re Kobra Props.*, 406 B.R. 396, 400–01 (Bankr. E.D. Cal. 2009) (noting that a motion to appoint a CRO elicited the court's "skepticism because of the vagueness of the CRO concept in the context of chapter 11 . . . and the inability to articulate whether and how those duties would contrast with the duties of a chapter 11 trustee"); *In re Tamarack Resort, LLC*, 2010 WL 4117459, at *14 (Bankr. D. Idaho 2010) (holding that the Bankruptcy Code does not tolerate the

appointment of a CRO with less than the full duties and accountability of a trustee or debtor in possession).

In short, the Bankruptcy Court could not have used its limited equitable power to craft and oversee Genser's position as CRO and Tate's position as CFO. *See generally* Michael P. Cooley, *Two Round Holes and One Square Peg: The Employment of Turnaround Consultants under §§ 327 and 363*, Am. Bankr. Inst. J., Sept. 24, 2005, at 42 (explaining how the employment of CROs "subsist[s] in the twilight" between various Bankruptcy Code provisions). Instead, the Bankruptcy Court turned Genser and Tate loose to orchestrate the rebirth of Black Diamond by running the company. Thus, any liability to the Plaintiff for causing the estate to lose value stems from their employment as corporate officers. And as the Court has already explained, compensatory damages against a corporate officer are a legal remedy. *See supra* Part III.A(1). Like the Sergent Claims, the fact that the Plaintiff seeks a legal remedy—compensatory damages—carries the day and entitles her to a jury trial. *Accord Amschwand v. Spherion Corp.*, 505 F.3d 342, 348 (5th Cir. 2007) ("Obtaining the lost policy proceeds [from a fiduciary], as [the plaintiff] requests, is simply a form of make-whole damages. This demand is not equitable in derivation, but is akin to the legal remedies of extracontractual or compensatory damages.") (citations omitted), *cert. denied by* 12 S. Ct. 2995 (June 27, 2008); *Pereira*, 413 F.3d at 340–41 (holding that a breach of fiduciary duty claim for compensatory money damages entitles the plaintiff to a jury trial); *Chao*, 2007 WL 4225069, at *5–6 (rejecting this surcharge argument).

### *(3) The Plaintiff has the right to a jury trial on the claims against A&M.*

Finally, the Seventh Amendment gives the Plaintiff the right to a jury trial against A&M. The Plaintiff alleges that, as Genser's and Tate's employer, A&M is vicariously

46

liable for their mismanagement of Black Diamond during its bankruptcy. Compl., *McKinstry*, 442 B.R. 567 (Pikeville No. 10-110-ART), R. 1-1 at 25–26 ¶¶ 61–62; *see also* Pl.'s Supp. Br., Pikeville No. 11-133-ART, R. 28 at 10. The A&M Defendants concede that the Plaintiff has a jury trial right against A&M if she has such a right against both Genser and Tate. Mots. Hr'g Tr., *McKinstry*, Pikeville No. 11-129-ART, R. 31 at 72–73 (Mr. Goodchild: "If the complaint is read as claiming respondeat superior against A&M, then the claim against A&M ought to follow what's done with respect to the claim against the two individuals."). Because the Plaintiff has a jury trial right against Genser and Tate, she also has such a right against A&M.

### (4) Black Diamond's bankruptcy does not waive the Plaintiff's jury trial rights.

Black Diamond's use of the Chapter 11 process has not waived the Plaintiff's jury trial rights on either the Sergent Claims or the A&M Claims. As the assignee of Black Diamond's A&M Claims, the Plaintiff has no greater right to a jury trial than Black Diamond possessed. *See, e.g., Nat'l City Bank Nw. v. Columbian Mut. Life Ins. Co.*, 282 F.3d 407, 409 (6th Cir. 2002); *Young v. Kenneth Jackson Elec., Inc.*, 2006 WL 2787077, at *3 (Ky. Ct. App. 2006). In the Sixth Circuit, a debtor that "voluntarily files for bankruptcy and is a defendant in an adversary proceeding" loses any right to a jury trial that it may have had on certain claims. *Longo v. McLaren* (*In re McLaren*), 3 F.3d 958, 961 (6th Cir. 1993). In *McLaren*, first-time investor William Longo turned to stockbroker William McLaren for financial advice. *Id.* at 959. McLaren convinced Longo to invest in business ventures in which McLaren had a personal financial interest—investments that eventually proved disastrous for Longo. *Id.* Meanwhile, because McLaren owed more than $10,000,000 to

various creditors, he voluntarily filed for bankruptcy.  *Id.*  Longo wanted to sue McLaren for the investment losses, but the Bankruptcy Code's automatic stay prevents a party from "commencing or continuing any litigation outside of the bankruptcy case to recover his claim."  *Id.* at 961.  To pursue his claim against McLaren, Longo had to initiate an adversary proceeding as a creditor in the bankruptcy court, which stripped him of any jury trial right he might have had on the claim.  *Id.* at 959.  McLaren then tried to invoke his jury trial right in the adversary proceeding.  *Id.*  But the Sixth Circuit held that McLaren had lost any such right by voluntarily filing for bankruptcy.  *Id.* at 961.  To hold otherwise, the court reasoned, would unjustly permit debtors to run into bankruptcy court to "block their creditors' access to a jury trial without compromising their own ability to demand a jury in their preferred forum."  *Id.* (quoting *N.I.S. Corp. v. Hallahan* (*In re Hallahan*), 936 F.2d 1496, 1506 (7th Cir. 1991)).

Sergent and the A&M Defendants contend that Black Diamond's bankruptcy has similarly extinguished its right to a jury trial on the Sergent Claims and the A&M Claims. *McLaren* is not directly on point.  Black Diamond neither entered bankruptcy voluntarily nor was sued as a defendant in the Sergent Claims and the A&M claims.  And three reasons counsel against extending *McLaren* to this case.

First, unlike the debtor in *McLaren*, Black Diamond started as an involuntary debtor. Black Diamond's lenders dragged Black Diamond and its seven subsidiaries into bankruptcy court involuntarily.  When the parent corporation, Black Diamond Resources LLC, realized that it could not escape Chapter 11, it consented to an agreed order for relief, submitted to the bankruptcy process, and even took advantage of the automatic bankruptcy stay.  *See Underlying Bankruptcy*, R. 59; *id.*, R. 69.  Being dragged kicking and screaming into an

involuntary bankruptcy hardly indicates Black Diamond's "knowing and voluntary waiver" of its jury trial rights. *Hergenreder v. Bickford Senior Living Group, LLC*, 656 F.3d 411, 420 (6th Cir. 2011) (quoting *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755–56 (6th Cir. 1985)).

In response, the defendants attempt to reject the importance of a distinction between voluntary and involuntary debtors.  They argue that once Black Diamond was in bankruptcy, the company fully availed itself of the bankruptcy process—for example, by obtaining the court's permission to reject the Consulting & Sales Agreement and the Royalty Agreement. This cooperation with the bankruptcy process, the defendants contend, is sufficiently voluntary to count as a waiver.  But the concern underlying *McLaren*—the inequity of permitting a defendant to wrap itself in the protection of the bankruptcy court and thereby eliminate a plaintiff's jury trial rights while keeping its own—does not logically extend to a bankruptcy that began involuntarily.  A waiver of constitutional rights in any context must be clear, and Black Diamond's cooperation with the bankruptcy process does not meet that standard.  *See, e.g., College Sav. Banks v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999); *Edelman v. Jordan*, 415 U.S. 651, 673 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 95 (1972); *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *see also NDEP Corp. v. Handl-It, Inc.* (*In re NDEP Corp.*), 203 B.R. 905, 912–13 (D. Del. 1996) ("[C]ourts should not be eager to embrace an implied waiver of constitutional rights where there is an affirmative and timely assertion of such rights").  Under defendants' standard, an involuntary debtor can preserve its constitutional right to a jury only by not cooperating with the bankruptcy proceeding.  For this proposition, the defendants cite no case law and for good

reason. Once dragged into court, the standard cannot be remain uncooperative and your rights are preserved.

The voluntary-involuntary distinction also provides a bright-line rule that unmistakably demarcates when a waiver has been knowing and intelligently given. It would be difficult for a party—never mind a court retrospectively evaluating bankruptcy filings—to pinpoint when a party's conduct crossed the threshold into a knowing and voluntary waiver. Consider the unpredictability of the defendants' proposal in light of the facts of this case. Is one voluntary bankruptcy out of eight enough? Does it matter that the parent company was the sole voluntary debtor? Or that the parent company was just an empty holding company for the subsidiaries? Or that the involuntary debtors cooperated with the bankruptcy process? What kinds of cooperation matter and how much do they matter? Is it enough to consent to an order of relief proposed by another party? And so on. Judicial modesty counsels against any attempt to draw a constitutionally significant line based on a judge's "intuitive sense of how far is *too far*." *Blakeley v. Washington*, 542 U.S. 296, 308 (2004) (rejecting a case-by-case approach for the Sixth Amendment's right to a jury trial because "the very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury").

Second, the potential for inequity in *McLaren* is not present here. In *McLaren*, the debtor was a potential defendant in a lawsuit, and the debtor voluntarily sought the protective shield of the bankruptcy court. The debtor's bankruptcy triggered the automatic stay, which required the would-be plaintiff to submit his claim to the equitable jurisdiction of the bankruptcy court and thereby surrender any right to a jury trial he may have otherwise had. Of course, the automatic stay forced Sergent to submit his Proofs of Claim to the equitable

50

jurisdiction of the Bankruptcy Court and thereby surrender his rights to a jury trial on those claims. *McLaren* prevents Black Diamond from inequitably invoking any right to a jury trial on the Proofs of Claim. But the Defendants argue that *McLaren* also compels the extinguishing of Black Diamond's right to a jury trial on the Sergent Claims. Unlike *McLaren*, however, Black Diamond was a potential plaintiff in a lawsuit against Sergent. Yet only claims *against* a debtor—not *by* a debtor—trigger the automatic stay and are required to proceed in bankruptcy court. *See* 11 U.S.C. § 362(a)(1)–(8). Consequently, Black Diamond's bankruptcy did not force Sergent to give up any jury trial right he may have had on the Sergent Claims. There is thus no *McLaren*-like concern that Black Diamond could have inequitably used the bankruptcy process as both a sword to strike down Sergent's right to a jury trial on the Sergent claims and a shield to protect its own right to a jury trial on the Sergent Claims. *Accord WSC, Inc. v. The Home Depot, Inc.* (*In re WSC, Inc.*), 286 B.R. 321, 326 (Bankr. M.D. Tenn. 2002) (rejecting an extension of *McLaren* to claims in which the debtor is the plaintiff).

Third and finally, a debtor submitting to the equitable jurisdiction of the bankruptcy court does not do so for all possible claims. By voluntarily filing for bankruptcy, a debtor only waives a jury trial right on those claims whose resolution "is necessarily part of the process of the disallowance and allowance of claims." *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1252 n.14 (3d Cir. 1994); *see also Ross*, 396 U.S. at 538 (holding that "legal claims are not magically converted into equitable issues by their presentation to a court of equity"). As the Court has already held, the Sergent Claims are not "equivalent to an objection" to Sergent's Proofs of Claim such that the Sergent Claims become part of the equitable claims allowance and disallowance process. *Citicorp N. Am. v.*

*Finley (In re Wash. Mfg. Co.)*, 133 B.R. 113, 117 (M.D. Tenn. 1991); *see also supra* Part I.A (describing the nature of the Sergent Claims).  And post-petition A&M Claims have nothing to do with the allowance and disallowance of claims in the Bankruptcy Court.  *Accord Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1329–31 (2d Cir. 1993) (refusing to hold that filing bankruptcy automatically forfeits a trustee's right to a jury trial in a lawsuit that sought "compensation for damage done" and had "nothing to do with the essence of the bankruptcy regulatory scheme of allowing or reordering claims"); *see also supra* Part III.A(2) (describing the nature of the A&M Claims).  The Bankruptcy Court's allowance and disallowance of claims against the estate would not resolve either of these sets of counterclaims.  In short, the constitutional right to a trial by jury is "not so ephemeral" that it dissipates because of Black Diamond's cooperation with the bankruptcy process.  *In re NDEP Corp.*, 203 B.R. at 912.

### *(5) The Plaintiff's jury trial rights have not been contractually waived.*

Nor does the Engagement Letter between Black Diamond and A&M waive the Plaintiff's jury trial rights on the A&M Claims.  Near the beginning of the bankruptcy, Black Diamond hired Genser, Tate, and A&M by entering into an Engagement Letter with A&M. This Engagement Letter waived Black Diamond's and A&M's jury trial rights "in any action, proceeding or counterclaim brought by or on behalf of the parties hereto with respect to any matter relating to or arising out of the performance or non-performance of [Black Diamond] or A&M hereunder."  Engagement Letter, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 ¶ 9.  Once the hope of a successful reorganization vanished and the Bankruptcy Court assigned the A&M Claims to the Trust, the Plaintiff and A&M entered into a Settlement Agreement, which does not contain a jury trial waiver.  The Settlement

Agreement includes an integration clause, which indicates that the Settlement Agreement "supersedes any and all prior agreements between the parties concerning the matters set forth herein."  Settlement Agreement, *id.*, R. 2 Ex. 1 ¶ 17.

The Settlement Agreement's absence of a jury trial waiver supersedes the Engagement Letter's jury trial waiver.  An integrated agreement, such as the Settlement Agreement, supersedes all prior agreements to the extent that the prior agreements are inconsistent with the integrated agreement on the same subject matter.  *Bluegrass Ctr., LLC v. U.S. Intec, Inc.*, 49 F. App'x 25, 33–34 (6th Cir. 2002); *see also KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 225 (W.D. Ky. 1982); Second Restatement of Contracts § 213(2) ("A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.").

The Settlement Agreement governs the scope of the Plaintiff's rights to bring claims against the A&M Defendants for mismanaging Black Diamond during the bankruptcy.  The Settlement Agreement set up a comprehensive framework for recovering against the A&M Defendants by:

- Assigning the A&M Claims to the Trust for prosecution instead of releasing the A&M Defendants from any liability to Black Diamond. *Compare* Settlement Agreement, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 ¶ 1 *with id.* at 2 (twelfth "whereas" clause).

- Requiring the Trust to "post adequate security" for the A&M Defendants' defense costs before filing any suit against them and establishing detailed procedures for how the Trust can set up the security as well as how A&M can draw from it. *Id.* ¶¶ 2–3.

- Laying out timing and procedural requirements for the Plaintiff's commencement of any action against the A&M Defendants. *Id.* ¶ 4.

- Specifying the limits of the Trust's recovery on the A&M Claims depending on whether the claims were subject to indemnity under the

Engagement Agreement. *Id.* ¶ 6. Specifically, the parties agreed to limit the Trust's recovery for claims covered by various insurance policies, but not to limit the Trust's recovery for claims that fell outside the insurance coverage. *Id.*

- Obtaining the Committee's (the predecessor to the Trust) promise not to object to the release of other claims against A&M. *Id.* ¶ 8.

- Requiring each party to bear its own attorney's fees and costs for any claims against the A&M Defendants described in the Settlement Agreement. *Id.* ¶ 15.

If the parties had wanted to require the Plaintiff to resolve her claims without a jury, they would have incorporated this waiver from the Engagement Letter into the Settlement Agreement. They did not.

In response, the A&M Defendants contend that the subject matter of the Settlement Agreement was much narrower. The Settlement Agreement, they argue, only "resolved the Trust's objections to the proposed [Plan of Liquidation] regarding the terms of the Debtors' indemnification" of the A&M Defendants. A&M's Br. in Resp., *McKinstry*, Pikeville No. 11-133-ART, R. 4 at 22. There is no doubt that the Settlement Agreement smoothed the way to confirming the plan of liquidation. But as the foregoing sample of its terms indicates, the Settlement Agreement addresses a much broader subject matter than just Black Diamond's indemnification of the A&M Defendants.

The A&M Defendants also argue that the Settlement Agreement does not negate the Engagement Letter's jury trial waiver because the Settlement Agreement does not mention the right to a jury trial at all. This logic turns contractual interpretation on its head. For example, the parties expressly chose to incorporate the indemnification provisions of the Engagement Letter into the Settlement Agreement. *See* Settlement Agreement, *McKinstry*, Pikeville No. 11-133-ART, R. 2 Ex. 3 ¶ 9. If all of the terms of the Engagement Letter not

mentioned in the Settlement Agreement continue in full force, as the A&M Defendants contend, then this incorporation of the indemnification provisions is completely superfluous. Indeed, the A&M Defendants' method of interpretation would almost completely erase the need for incorporation by reference at all.

And contrary to the A&M Defendants' fears, the Settlement Agreement does not abrogate the entirety of the Engagement Letter. The Settlement Agreement only supersedes the Engagement Letter to the extent that that the Engagement Letter sets forth conditions and limitations on suits against the A&M Defendants. All other aspects of the Engagement Letter remain in force.

The A&M Defendants also argue that the Settlement Agreement cannot revoke Black Diamond's waiver of its jury trial rights because Black Diamond was not a party to the Settlement Agreement. A&M's Supp. Br., *McKinstry*, Pikeville No. 11-133-ART, R. 21 at 7. But by waiting until the second round of supplemental briefing to raise this argument, they have waived it. *Cf. Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (holding that a party waived an argument before the district court by first raising it in her reply brief and the other side was "not afforded a response to this reply").

Even if doubt remains about the scope of the Settlement Agreement, this Court must "indulge every reasonable presumption against waiver." *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937); *see also Winter v. Minn. Mut. Life Ins. Co.*, 199 F.3d 399, 407 n.11 (7th Cir. 1999) ("There is a presumption against waiver of the constitutional right to trial by jury."). The A&M Defendants have not rebutted this presumption.

**B.      Even though there is cause to withdraw the reference, doing so would be premature.**

When a party is entitled to a jury trial, cause to withdraw the reference "automatically exists" without regard to the remaining factors. *E.g., Caudill v. Burrows* (*In re Oasis Corp.*), 2008 WL 2473496, at *2 (S.D. Ohio June 18, 2008) (No. C2-08-00288). After all, the Bankruptcy Code prohibits a bankruptcy court from conducting jury trials unless it is "specially designated to exercise such jurisdiction by the district court" and has "the express consent of all the parties." 28 U.S.C. § 157(e). Because neither of these requirements is met, the only question is *when* to withdraw the reference. And it is too soon to do so because there are still unfinished pretrial matters with which the Bankruptcy Court has greater familiarity.

Only half of this case appears ready for trial: the Plaintiff's claims against the A&M Defendants. Factual discovery between these parties closed on September 6, 2011. *Adversary Proceeding*, R. 28 at 1 (July 27, 2011). Before the dispositive motions deadline expired one week later, A&M filed a motion for summary judgment, *id.*, R. 82, which the Bankruptcy Court later denied, *see* Mem. Op., *id.*, R. 144. And before the Court stayed the *Adversary Proceeding* on October 21, 2011, the parties had partially briefed two motions in limine, *id.*, R. 115 & R. 116, and were scheduled to proceed to trial by affidavit on January 25, 2012, *id.*, R. 132. *Accord* Mots. Hr'g Tr., *Sergent*, Pikeville No. 11-129-ART, R. 31 at 65 (Mr. Goodchild: "Your Honor, the case was ready to go. Discovery's done. The experts are picked. The trial exhibits are disclosed. All we had to do was submit the briefs and call our first witness."). *But see id.* at 65–66 (Mr. Goroff: "Discovery is not closed, Your Honor.").

56

The Bankruptcy Court, however, remanded the Sergent Claims to state court on June 23, 2011. *See* Abstention Order, *Adversary Proceeding*, R. 58. Sergent has not responded to the claims against him or had a chance to take any discovery on the claims in federal court. He also has not had a chance to take discovery with respect to any theory of contribution he may wish to pursue against the A&M Defendants. And he has not had a chance to file any dispositive motions in the case. *See* A&M's Notice of Filing, *McKinstry*, Pikeville No. 11-133-ART, R. 17 at 5 ("[T]he claims against Sergent have not even been answered, no discovery has occurred, and essentially that case has had no substantive proceedings."); Mots. Hr'g Tr., *Sergent*, Pikeville No. 11-129-ART, R. 31 at 41 (Mr. Geller: "So what about the discovery, the redundant discovery we're going to be doing of many of the same parties to try to figure out who was at fault, if anyone was at fault?"); *id.* at 77 (Mr. Goodchild: "Mr. Sergent hasn't elected to take any kind of discovery or do anything like that."); *id.* at 79 (The Court: "Are you saying the case is ready for trial?" Mr. Goroff: "No. Absolutely not."); *id.* (Mr. Goroff: "[T]here is discovery that remains to be done. There is preparatory work that remains to be done. It's not that old of a case.").

Therefore, the Court denies the Plaintiff's motion to withdraw without prejudice. The Bankruptcy Court shall handle all remaining pretrial matters in this case, including determining and managing the scope of any remaining discovery by the parties. *See, e.g.*, *In re Lost Peninsula Marina Dev. Co., LLC*, 2010 WL 3070134, at *4 (E.D. Mich. Aug. 4, 2010); *Doucet v. Drydock Coal Co.* (*In re Oakley*), 2007 WL 710244, at *3 (S.D. Ohio Mar. 6, 2007). On the A&M Claims, the Bankruptcy Court may issue final decisions on all dispositive motions, which it appears to have already done. In an abundance of caution, however, the Bankruptcy Court will issue proposed findings of fact and conclusions of law

57

on any dispositive motion involving the Sergent Claims. When the Bankruptcy Court certifies in a written order that both the Sergent Claims and the A&M Claims are trial-ready, then the Court will grant any party's motion to withdraw the reference. At that time, the Court will set a trial schedule and handle any motions in limine that may arise.

## CONCLUSION

Accordingly, it is **ORDERED** that:

1)      With respect to Sergent's appeal, Pikeville No. 11-129-ART, the Bankruptcy Court's Abstention and Remand Order, *McKinstry v. Sergent*, No. 11-07010-JMS (Bankr. E.D. Ky. 2008), R. 27, is **VACATED AND REVERSED IN PART**. The Bankruptcy Court's order to abstain from and remand the Plaintiff's state-law claims against Sergent is **VACATED AND REVERSED**. The Bankruptcy Court's order refusing to abstain from the Plaintiff's state-law claims against the A&M Parties has not been appealed to this Court, and so the Court does not address the merits of that decision. Sergent's appeal, Pikeville No. 11-129-ART, is **STRICKEN** from this Court's active docket.

2)      The Plaintiff's amended motion to withdraw the reference of its state-law claims against Sergent and the A&M Parties, Pikeville No. 11-133-ART, R. 2, is **DENIED WITHOUT PREJUDICE**. The Bankruptcy Court shall **CONDUCT** all remaining pretrial matters, including any discovery on the Sergent Claims. If further dispositive motions arise, the Bankruptcy Court must **SUBMIT** proposed findings of fact and conclusions of law on any issues involving the Sergent Claims and must **ENTER** final orders on any issues involving the A&M Claims. The Bankruptcy Court shall **CERTIFY** in a **WRITTEN ORDER** when (a) all fact and expert discovery has closed; (b) the dispositive motions deadline has expired and the Bankruptcy Court has ruled on all dispositive motions; and (c) the case is trial-ready. At this time, any party may file a motion to withdraw the reference in this Court. Upon

withdrawal, the Court will schedule a date for trial and set a briefing timeline for any motions in limine and other trial matters.  This action for withdrawal, Pikeville No. 11-133-ART, is **STRICKEN** from this Court's active docket.

3)   The Court previously stayed the Bankruptcy Court's Abstention Order, *McKinstry v. Sergent*, No. 11-07010-JMS (Bankr. E.D. Ky. 2011), R. 27, until the Court resolved Sergent's appeal.  Minute Entry Order, Pikeville No. 11-129-ART, R. 20 at 2; Pikeville No. 11-133-ART, R. 12 at 2.  Therefore, the **STAY**, Pikeville No. 11-129-ART, R. 20 at 2; Pikeville No. 11-133-ART, R. 12 at 2, **IS LIFTED**.

4)   The Clerk shall **SEND** a copy of this Memorandum Opinion and Order to the Clerk of the United States Bankruptcy Court for the Eastern District of Kentucky.

5)   The Plaintiff's jury demand for Counts I, II, III, IV, and V is **SUSTAINED**.

This the 21st day of March, 2012.



**Signed By:**

*Amul R. Thapar*

**United States District Judge**