UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| TAFT A. MCKINSTRY, as Trustee of the BD Unsecured Creditors Trust, <br><br> Petitioner, <br><br> v. <br><br> HAROLD E. SERGENT, et al., <br><br> Respondents. | Civil No. 11-133-ART <br><br> **MEMORANDUM OPINION & ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The Court previously issued an opinion addressing several novel and complex questions about whether a bankruptcy debtor's representative, Taft A. McKinstry, is entitled to a jury trial on her claims against the debtor's former officers, Harold Sergent and the A&M Parties. Those officers have now moved to certify the Court's opinion for interlocutory appeal. Since Sergent and the A&M have not shown that substantial room for disagreement exists about the correctness of the Court's rulings, their motions for interlocutory appeal are denied.

### BACKGROUND

The Court has already described the facts of this case elsewhere. *See Sergent v. McKinstry*, 472 B.R. 387, 391–95 (E.D. Ky. 2012). Briefly, Harold Sergent formed a coal company called Black Diamond to buy promising but undeveloped coal assets in Floyd County, Kentucky. *Id.* at 391. While in charge of Black Diamond, he allegedly engaged in self-dealing by funneling royalties to himself for each ton of coal that Black Diamond sold

regardless of whether Black Diamond would profit on the sale. *Id.* at 391–92. He supposedly committed Black Diamond to long-term supply contracts with coal purchasers to sell more coal than the company could produce from its own mines. *Id.* at 392. This production deficit required Black Diamond to purchase the difference on the spot market to fulfill its supply contracts. *Id.* This strategy was successful for the first two years. *Id.* But it turned out to be a disastrous gamble when the spot-market price exceeded the selling price under the company's existing supply contracts. *Id.* Concerned about Black Diamond's continued ability to satisfy its liabilities, the company's lenders insisted that it hire Alvarez & Marsal North America, LLC ("A&M") as a financial advisor. *Id.* Yet at this point A&M's financial advice was of limited use: the spot-market price continued to increase, and Black Diamond remained locked into the supply contracts. *Id.*

With Black Diamond's liabilities rapidly outstripping its assets, the company's lenders turned to the Chapter 11 bankruptcy process with the hope of reorganizing Black Diamond as a profitable company. *Id.* The lenders filed involuntary petitions in the United States Bankruptcy Court for the Eastern District of Kentucky against Black Diamond and its seven subsidiaries. *Id.* Once there, the parties agreed to create a new senior management position within the company—Chief Restructuring Officer ("CRO")—and to appoint a specialist in turnaround management from A&M to this position. *Id.* The Bankruptcy Court authorized Black Diamond to hire Ira Genser as the CRO; Genser, in turn, hired his colleague, Larry Tate, as the Chief Financial Officer ("CFO"). *Id.* at 393. Consistent with the Bankruptcy Court's order authorizing the CRO position, Black Diamond and A&M entered into a court-approved Engagement Letter that described the scope of A&M's turnaround management services, Genser's responsibilities as CRO, and Tate's employment

as CFO. *Id.*

A&M, Genser, and Tate (collectively, the "A&M Parties") took over Black Diamond's day-to-day management while in bankruptcy. *Id.* While in charge, the A&M Parties allegedly ignored the advice of Black Diamond's senior management in favor of the lenders' preference to sell the company at a profit, regardless of whether those preferences were in the company's best interests. *Id.* Then the global economic collapse struck in the fall of 2008. The spot-market price of coal dropped, taking Black Diamond's value down with it. *Id.* The hope of a profitable reorganization quickly dissipated. *Id.* The company filed a plan of liquidation, which the Bankruptcy Court confirmed in July 2009. *Id.* This plan created a trust and appointed Taft McKinstry as its trustee to liquidate some of the company's assets, including any claims against Sergent and the A&M Parties for mismanagement. *Id.* at 393–94. McKinstry and the A&M Parties then entered into a Settlement Agreement to set some of the ground rules for the forthcoming litigation. *Id.* at 394.

McKinstry sued Sergent and the A&M Parties (collectively, the "Defendants") in state court before the case was removed to federal court and referred to the Bankruptcy Court. *Id.* She asserted state-law breach of fiduciary duty and gross negligence claims against Sergent, *id.* at 405, gross negligence claims against Genser and Tate, *id.* at 409, and vicarious liability against A&M., *id.* at 415. Soon after, the Bankruptcy Court decided to abstain from and remand the claims against Sergent, but to keep the claims against A&M. *Id.* at 394. Sergent appealed this severing of the case, and McKinstry moved to withdraw this Court's reference of this case, which would allow the Court to adjudicate both sets of claims. *Id.* In a Memorandum Opinion and Order dated March 21, 2012 (the "Order"), the

Court reversed the Bankruptcy Court in Sergent's appeal because mandatory abstention did not apply to the Sergent Claims. *Id.* at 403. And because McKinstry was entitled to a jury trial on all of her claims, the Court held that withdrawal of the reference would be appropriate when the case was trial-ready because the Bankruptcy Court could not conduct a jury trial. *Id.* at 420. Since discovery and dispositive motions were not yet finished, however, withdrawal was premature. *Id.* at 421. So the Court referred the case back to the Bankruptcy Court to conduct all remaining pretrial matters. *Id.* at 422. Twenty-eight days later, the Defendants moved to certify the Order for interlocutory appeal. R. 26; R. 27.

## DISCUSSION

In the "great bulk" of cases, the federal judiciary permits litigants only one shot at an appeal. *McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004). A litigant's case proceeds until he loses or wins on all of his claims and the district court enters final judgment, triggering his right to appeal. 28 U.S.C. § 1291. Of course, Congress recognized that in "rare" circumstances, certain questions should not wait for final judgment before the Court of Appeals enters the fray. *McFarlin*, 381 F.3d at 1264. When a district judge finishes grappling with such a question, he has discretion to certify his ruling to the Court of Appeals for immediate review. *In re Powerhouse Licensing, LLC*, 441 F.3d 467, 471 n.2 (6th Cir. 2006) ("Certification of an order under § 1292(b) is discretionary with the district court and is not subject to review.").

What type of question merits such exceptional treatment? A "controlling question of law" where "substantial ground for difference of opinion exists about the correctness of the decision" and "an immediate appeal may materially advance the ultimate termination of the litigation." *W. Tenn. Ch. of Assoc. Builders & Contractors, Inc. v. City of Memphis (In re*

4

*City of Memphis)*, 293 F.3d 345, 350 (6th Cir. 2002) (citing 28 U.S.C. § 1292(b); *Cardwell v. Chesapeake & Ohio Ry. Co.*, 504 F.2d 444, 446 (6th Cir.1974)).  Because the Defendants have not presented a substantial ground for disagreement about the Court's Order, no deviation from the normal appellate process is warranted.

**I.    The Defendants' motions for certification are timely.**

As a threshold matter, McKinstry argues that the Court should deny the Defendants' motions as untimely because the Defendants moved for certification more than ten days after the Order.  R. 28 at 22–23 (Br. at 21–22).  This argument is meritless.  The procedure for obtaining interlocutory review is straightforward.  Such review requires permission from both the district court and the Court of Appeals.  The district judge must first certify in its order that the requirements for interlocutory review are satisfied.  28 U.S.C. § 1292(b).  If the district judge does so, then the Court of Appeals may, "in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order."  *Id.*

Of course, a district judge often does not certify an order when entered.  This makes sense: the district judge "naturally looks to the parties to advise him on whether to certify an order for immediate appeal, and they can hardly do that until they have seen the order." *Weir v. Propst*, 915 F.2d 283, 286 (7th Cir. 1990).  In addition, whether an order should be certified sometimes does not become apparent until later in the case.  *Id.*  Regardless of the reason, the ten-day limit for applying to the Court of Appeals does not prevent a district judge from certifying a stale order.  Instead, the judge simply amends his order to include the necessary certification.  Fed. R. App. P. 5(a)(3).  And "in that event, the time to petition [the Court of Appeals] runs from entry of the amended order" that includes the certification. *Id.*

5

As a result, the ten-day time limit restricts the time for appealing to the Court of Appeals once an order has been certified—not, as McKinstry argues, "to filing a motion for interlocutory appeal with a district court." *Eagan v. CSX Transp., Inc.*, 294 F. Supp. 2d 911, 914 (E.D. Mich. 2003); *see also W. Tenn. Ch. of Assoc. Builders & Contractors, Inc. v. City of Memphis (In re City of Memphis)*, 293 F.3d 345, 348 (6th Cir. 2002) ("[A]n application for appeal must be made within 10 days *after the entry of the district court's certification order.*" (emphasis added)).

What, then, is the deadline for requesting certification from a district court? Section 1292(b) does not impose one. Because the Courts of Appeals may decline to accept a certified order for interlocutory appeal for any reason, *see* 16 Charles Alan Wright et al., Federal Practice & Procedure: Civil § 3929 (2d ed. 2012), though, courts generally require such requests to "be filed in the district court within a *reasonable time* after the order sought to be appealed." *Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 675 (7th Cir. 2000).

Here, the Defendants moved for certification within a reasonable time. The Court issued its Memorandum Opinion and Order on March 21, 2012. R. 25. Twenty-eight days later, the Defendants moved to amend this order by certifying it for interlocutory appeal. R. 26; R. 27. That length of time was reasonable given the length and complexity of the Court's Order and is in line with similar post-judgment deadlines under the Federal Rules of Civil Procedure. *See, e.g.*, Fed. R. Civ. P. 50(d) (requiring a motion for a new trial to be filed within twenty-eight days); Fed. R. Civ. P. 59(e) (requiring motions to alter or amend a judgment to be filed within twenty-eight days). Besides, McKinstry does not identify any prejudice that resulted from the twenty-eight-day wait. The Defendants' motions were therefore timely. *Cf. In re Yasmin & Yaz Mktg.*, 2012 WL 662334, at *1 (S.D. Ill. Feb. 29,

2012) (holding that a two-month delay was unreasonable); *Lindley v. Life Investors Ins. Co. of Am.*, 2010 WL 2465515, at *2–3 (N.D. Okla. June 11, 2012) (holding the same for a two-and-a-half month delay); *Fabricant v. Sears Roebuck & Co.*, 2001 WL 883303, at *1 (S.D. Fla. Jan. 29, 2001) (holding that a one-and-a-half-month delay was untimely).

II.     **Interlocutory appeal is not appropriate here.**

Sergent and the A&M Parties seek interlocutory review of the Court's ruling that McKinstry had the right to a jury trial on all of her claims. R. 26-1 at 5; R. 27-1 at 2 ("By the Motion, Sergent seeks certification only of [the jury trial] ruling."). That ruling turned on three holdings: (1) that the Seventh Amendment preserved McKinstry's jury-trial right on all of her claims; (2) that Black Diamond's bankruptcy did not extinguish her jury-trial right; and (3) that her jury-trial rights against A&M were not contractually waived. *Sergent*, 472 B.R. at 405, 415–16, 418.

Even assuming that these rulings involve controlling questions of law and that an interlocutory appeal may materially advance this case, the Defendants have not satisfied their burden of showing that there is a substantial ground for disagreement about their correctness. *See United States v. Stone*, 53 F.3d 141, 143–44 (6th Cir. 1995) (holding that "[d]oubts regarding appealability . . . [should be] resolved in favor of finding that the interlocutory order is not appealable" (quotation omitted)). A substantial ground for disagreement exists when the controlling law is unclear on a difficult issue. *Couch v. Telescope, Inc.*, 611 F.3d 629, 633–34 (9th Cir. 2010). Indicators include a difference of opinion among the district courts within a circuit, a circuit split that the Sixth Circuit has not yet entered, precedent that does not substantially guide the Court's decision, or a novel and difficult question of first impression. *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 2009 WL

7

3390244, at *2 (E.D. Mich. Oct. 20, 2009) (internal quotation marks and citations omitted); *Couch*, 611 F.3d at 634. Here, the Defendants have not established a substantial ground for disagreement on any of the Court's three holdings, and thus interlocutory appeal is improper.

### A. McKinstry had a Seventh Amendment right to a jury trial on her claims.

The Court held that the Seventh Amendment afforded McKinstry jury-trial rights on all of her claims. *Sergent*, 472 B.R. at 405. Only the A&M Parties seek certification on this ruling, but there can be no serious dispute over this constitutional question. The Seventh Amendment preserves the right to a jury trial on issues that resolve legal rights rather than equitable ones. *Bledsoe v. Emery Worldwide Airlines, Inc.*, 635 F.3d 836, 841 (6th Cir. 2011) (citing *Wooddell v. Int'l Bhd. of Elec. Wkrs., Local 71*, 502 U.S. 93, 97 (1991)). That legal-versus-equitable determination depends on a two-party inquiry into (1) the historical nature of the cause of action and (2) the nature of the remedy sought, with this second inquiry being the tiebreaker (the "*Granfinanciera*" test). *See generally Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989).

Under the first prong, history is clear: a corporation's suit against its officers could be heard in either courts of law under negligence or courts of equity under breach of fiduciary duty. *Sergent*, 472 B.R. at 406–08. So the Court held that the A&M Claims, which seek recovery for breach of the fiduciary duty to maximize the value of Black Diamond for all creditors and equity holders, were historically equitable. *Id.* at 409–10. The A&M Parties do not dispute this conclusion. R. 26-1 at 9.

Instead, the A&M Parties claim that there is substantial disagreement over the second and "more important" step of the *Granfinanciera* inquiry—that McKinstry's monetary remedy sought is legal rather than equitable. *Chauffeurs, Local No. 391 v. Terry*, 494 U.S.

8

558, 565 (1989). And to show this substantial disagreement, they point to other courts holding that "actions against officers of a debtor in possession for breaches of their fiduciary duties to the estate" invoke an equitable remedy called "surcharge." R. 26-1 at 10. To be fair, even "[t]he authorities are split" on when and how an equitable surcharge is the equivalent of legal compensatory damages. *Sergent*, 472 B.R. at 411.

Focusing on the disagreement over the nature of a surcharge, though, mistakes the forest for the trees. As the Court also held, even if money damages against a fiduciary were equivalent to a surcharge, history is clear that there was "concurrent equitable and legal jurisdiction over compensatory money damages against a corporate director." *Id*. The existence of concurrent jurisdiction meant that the Seventh Amendment preserved McKinstry's right to have a jury determine the amount of damages. The Defendants have not pointed to any events since the merger of law and equity that would have eliminated legal jurisdiction over such monetary relief.

To be sure, this second part of the inquiry is not supposed to "replicate the 'abstruse historical' inquiry of the first part," but instead "requires consideration of the general types of relief provided by courts of law and equity." *Terry*, 494 U.S. at 571 n.8 (quoting *Ross v. Bernhard*, 396 U.S. 531, 538 n.10 (1970)). Consistent with that instruction, the Supreme Court has limited equitable remedies to two bright-line categories: when the plaintiff seeks equitable restitution of property or funds in the defendant's possession or when the money is "incidental to or intertwined with injunctive relief." *Id.* at 570–71 (quoting *Tull v. United States*, 481 U.S. 412, 424 (1987)). Neither applies here. If the Supreme Court wants to create a third category of equitable relief that includes all monetary relief against corporate officers for their mismanagement, it may choose to do so in the future, but such speculation

9

is not a basis for an interlocutory appeal.

Most importantly, and as the Court already held, even if a surcharge against corporate officers were an exclusively equitable remedy, a surcharge is not what McKinstry seeks. That remedy is available when a plaintiff asks for an equitable accounting, which requires the estate's trustee to "account for" the property on hand. *Sergent*, 472 B.R. at 410. McKinstry simply does not seek such an accounting. *See id.* at 411. Nor could she: as corporate officers, Genser and Tate were not analogous to trustees because their positions were not authorized by the Bankruptcy Court's limited equitable power to supervise Chapter 11 trustees and other court-appointed officers. *Id.* at 413. Their powers and positions were simply the result of their contractual employment as corporate officers. *Id.* Now protesting that reasonable minds could disagree, they simply proclaim that "[a]nother neutral arbiter could analogize Genser and Tate's fiduciary duties to those of a trustee." R. 26-1 at 11. For this proposition, they cite no competing case law and no authority in the Bankruptcy Code. *See id.* And "just because a court is the first to rule on a particular question . . . does not mean that there is . . . a substantial difference of opinion." *Couch*, 611 F.3d at 633 (citation omitted). All the more reason that an interlocutory appeal is inappropriate.

### B. Black Diamond's bankruptcy did not extinguish McKinstry's jury trial right.

Given that McKinstry had a constitutional right to a jury trial on her claims, the Court's next step was to determine whether Black Diamond waived that right when it entered bankruptcy. *Sergent*, 472 B.R. at 415–16. In the Sixth Circuit, "the Seventh Amendment confers no right to a jury trial on a debtor . . . who files voluntarily for bankruptcy and is a defendant in an adversary proceeding." *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961

10

(6th Cir. 1993). The Sixth Circuit based this holding on one specific concern: A potential defendant could run into bankruptcy court to trigger the automatic stay, which prevents the would-be plaintiff from suing outside of the bankruptcy court and require him to submit his claims to the bankruptcy court's claims-allowance process. *Id.* (quoting *Hallahan*, 936 F.2d at 1506). By funneling the plaintiff's claims to this equitable process, the defendant would force the plaintiff to give up his jury trial rights on those claims. As the Sixth Circuit reasoned, allowing the defendant to turn around and demand a jury trial in the bankruptcy process would be inequitable. *See Sergent*, 472 B.R. at 417–18 (explaining *McLaren*'s reasoning). The Defendants argued that *McLaren* should be extended here, eliminating Black Diamond's (and as its assignee, McKinstry's) jury trial rights. *Sergent*, 472 B.R. at 416. The Court rejected this extension for three reasons, each of which, according to Sergent, involves substantial room for disagreement. *See* R. 27-1 at 4. He is incorrect.

First, the Court refused to extend *McLaren* to involuntary debtors like Black Diamond. *Sergent*, 472 B.R. at 416–17. This difference mattered because the *McLaren* Court's concern did not logically extend to an involuntary bankruptcy. *Id.* at 417. Sergent tries to make room for substantial disagreement by reading the tea leaves floating in *McLaren*. He argues that the Sixth Circuit, by choosing not to comment on any distinction between voluntary and involuntary debtors, "was signaling that there is no difference." *See* R. 27-1 at 9. *McLaren*, however, expressly limited its holding to a debtor "who files *voluntarily* for bankruptcy." *McLaren*, 3 F.3d at 961 (emphasis added). Nor does Sergent point to any competing case law holding that involuntary debtors lose their jury trial rights by entering bankruptcy. A "'dearth of cases' does not constitute 'substantial ground for difference of opinion.'" *Couch v. Telescope, Inc.*, 611 F.3d at 633–34 (quoting *Union Cnty.*,

*Iowa v. Piper Jaffray & Co., Inc.*, 525 F.3d 643, 647 (8th Cir. 2008)).

Undeterred, Sergent argues that even if the voluntary/involuntary distinction is correct, there is uncertainty about whether the Court applied it correctly here. R. 27-1 at 9–11. Sergent returns to a familiar argument: that Black Diamond was a "de facto voluntary debtor" because its management "actively supported the entry of orders of relief" on behalf of Black Diamond. *Id.* at 10–11. Yet Sergent's argument misunderstands the distinction. As the Court held, this distinction is a bright-line rule that depends on whether the petitions were voluntary or involuntary—not a case-by-case standard that depends on the debtor's conduct after the petition is filed. Sergent does not cite any authority supporting his notion that courts should take a "hard look" behind a petition to determine whether it is voluntary or involuntary for determining jury trial rights. Nor would a "hard look" be consistent with how the Bankruptcy Code treats the voluntary/involuntary distinction in Chapter 11 cases. *See* 11 U.S.C. § 301(a) (looking to the face of the petition to determine whether a voluntary case has been commenced); 11 U.S.C. § 303(a) (same for involuntary cases). And relying solely on the face of the petition is exactly what the Sixth Circuit did in *McLaren*. As Sergent must concede, the petitions in Black Diamond's underlying bankruptcy were involuntary. That is the beginning and end of the inquiry, and one about which there can be no substantial disagreement.

Second, *McLaren* held that a potential *defendant* who becomes a voluntary debtor loses its jury trial rights, but the Court declined to extend that holding to a potential *plaintiff* who enters bankruptcy, like Black Diamond. *Sergent*, 472 B.R. at 417–18. To be sure, some other courts outside the Sixth Circuit have not adopted this distinction. *See* R. 27-1 at 6 (collecting cases). But those cases do so based on concerns different from the one

12

underlying *McLaren*. *McLaren*'s holding targeted a specific inequity: allowing a potential defendant to become a debtor, thereby invoking the automatic stay and forcing that potential plaintiff to become a creditor in bankruptcy court without any jury-trial right. That inequity does not exist when a potential plaintiff becomes a debtor because a crucial link is broken. A plaintiff who enters bankruptcy does not trigger the automatic stay, which applies only to claims *against* a debtor, and thus does not necessarily force the would-be defendant to give up its jury-trial rights on the plaintiff's claims. *Id.* at 418. Sergent does not explain why it is substantially unclear whether *McLaren*'s logic should be extended. And faced with this extension of *McLaren*, at least one other district court in this circuit has agreed with the Court. *WSC, Inc. v. The Home Depot (In re WSC, Inc.)*, 286 B.R. 321, 326 (Bankr. M.D. Tenn. 2002). Of course, the Sixth Circuit may identify new concerns in the future that justify a similar rule for potential plaintiffs, but the inequity addressed by *McLaren* is not one of those concerns. Consequently, there is no basis for an immediate appeal on whether *McLaren* applies to a plaintiff-debtor.

Third, the Court held that, even under *McLaren*, potential defendants who become voluntary debtors do not lose their jury trial rights on "all possible claims." *Sergent*, 472 B.R. at 418. Rather, a debtor waives its jury trial right only on those claims "whose resolution 'is necessarily part of the process of the disallowance and allowance of claims.'" *Id.* (quoting *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1252 n.14 (3d Cir. 1994)). Because the state-law Sergent Claims and A&M Claims were not intertwined with the Bankruptcy Court's claims-allowance process, the Court concluded that *McLaren* would not extinguish those claims. *Sergent*, 472 B.R. at 418.

Sergent claims that a circuit split exists on whether "a debtor's submission to the

13

equitable jurisdiction of the bankruptcy court affects a blanket forfeiture of jury trial rights." R. 27-1 at 7. According to Sergent, the Sixth Circuit in *McLaren* and the Seventh Circuit in *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1506 (7th Cir. 1991)), endorsed such a blanket forfeiture, while the Second and Third Circuits have held that only proceedings implicating the claims-allowance process are forfeited. R. 27-1 at 7.

While *McLaren* contains one sentence in dicta vaguely hinting at an across-the-board waiver, "[t]here are good reasons not to read *McLaren* so broadly." *WSC, Inc.*, 286 B.R. at 961. *McLaren* held only that a potential defendant who becomes a voluntary debtor is not entitled to a jury trial to defend the dischargeability and amount of his debt to a creditor—a proceeding that was both historically equitable and part of the claims-allowance process. *In re McLaren*, 3 F.3d at 960. Its holding was no broader. And the Supreme Court has "rejected the argument that lies at the heart" of a blanket-forfeiture theory—that "the filing of the bankruptcy case itself somehow forfeits all Seventh Amendment rights in actions by a debtor to gather the bankruptcy estate." *WSC, Inc.*, 286 B.R. at 327 (discussing why the Supreme Court's precedent undermines a blanket-forfeiture theory). Unsurprisingly, other circuits, too, have rejected a blanket-forfeiture theory. *See Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1329–31 (2d Cir. 1993); *In re Jensen*, 946 F.2d 369, 373–74 (5th Cir. 1991); *Billing*, 22 F.3d at 1247–53 & n.14. And Sergent does not cite any cases extending the concerns in *McLaren* to claims that are not integral to the restructuring of debtor-creditor relationship. In fact, at least one other district court in this circuit has also held that *McLaren* does not mandate an across-the-board forfeiture of jury-trial rights. *See WSC, Inc.*, 286 B.R. at 328–29 (concluding that *McLaren*'s holding is limited to proceedings that are part of the equitable claims-resolution process). No ground for substantial disagreement exists here.

### C.  McKinstry's right to a jury trial on the A&M Claims was not contractually waived.

Lastly, the Court held that McKinstry's jury-trial right on the A&M Claims had not been contractually waived. *Sergent*, 472 B.R. at 418. After Black Diamond entered into an Engagement Letter that waived its jury trial rights on claims against the A&M Parties, McKinstry (as Black Diamond's assignee) and the A&M Parties entered into a Settlement Agreement, which did not contain a jury-trial waiver. *Id*. The Settlement Agreement superseded all prior agreements to the extent that they were inconsistent with the Settlement Agreement on the same subject matter. *Id.* at 419. So the question arose: what was the scope of the Settlement Agreement?

Numerous provisions indicated that the Settlement Agreement had set a "comprehensive framework for recovering" from the A&M Parties. *Id.* For example, it specified the recovery limits on the A&M Claims; assigned the A&M Claims to a liquidation trust for prosecution instead of releasing the A&M Parties from liability; and laid out various timing and procedural requirements for suing the A&M Parties. Because these and other provisions governed "the scope of [McKinstry's] rights to bring claims against the A&M Defendants for mismanaging Black Diamond during the bankruptcy," the Court concluded that the Settlement Agreement controlled the jury trial question. *Id.* Since the Settlement Agreement did not contain a jury-trial waiver, McKinstry's jury-trial right was not contractually waived.

According to the A&M Parties, this question is in serious dispute (and thus worthy of interlocutory review) because the Bankruptcy Court held that the Settlement Agreement was "far from clear and unambiguous." R. 26-1 at 13–14. Thus, "two different respected Judges

15

reaching different conclusions demonstrates substantial grounds for reasonable minds to differ." *Id.* That might be true except for one hurdle: to show room for substantial disagreement, it is not enough for the A&M Parties to show that their interpretation of the Settlement Agreement is within the range of permissible interpretations. After all, the Court must "indulge every reasonable presumption against waiver" of McKinstry's jury-trial right. *Sambo's Rests., Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)); *see also Winter v. Minn. Mut. Life. Ins. Co.*, 199 F.3d 399, 407 n.11 (7th Cir. 1999) ("There is a presumption against waiver of the constitutional right to trial by jury[.]" (citation omitted)). They must explain why there are substantial grounds for disagreement about whether they overcame this thumb on the scale. Yet the A&M Parties argue only that their interpretation was a reasonable one without offering any reason why the Court's was unreasonable. Their "strong disagreement with the Court's ruling is not sufficient for there to be a 'substantial ground for difference.'" *Couch*, 611 F.3d at 633 (internal quotation marks omitted).

The A&M Parties try to flip this presumption back onto McKinstry: as the party objecting to the contractual waiver, they claim, she has "the burden of demonstrating that [Black Diamond's] consent to the provisions was not knowing and voluntary." R. 26-1 at 13 (quoting *K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 758 (6th Cir. 1985)). This argument conflates whether a party's actions amount to a waiver of its jury-trial rights in the first place with whether a waiver is knowing and voluntary. On the latter, the party objecting to the voluntariness of an applicable waiver certainly bears the burden. *E.g.*, *K.M.C. Co.*, 757 F.2d at 758. Yet that was never the issue in this case: the Court did not hold that McKinstry's waiver was coerced. The question was whether there was an applicable waiver

16

at all—a question that requires "indulg[ing] every reasonable presumption against waiver." *Sambo's Rests., Inc.*, 663 F.2d at 690. The A&M Parties have not shown that there is room for substantial disagreement as to whether they have overcome this presumption.

## CONCLUSION

At the end of the day, everyone acknowledges that the jury-trial issue was factually and legally complex. That issue depended on the Court's review of (1) the events leading to Black Diamond's bankruptcy; (2) the bankruptcy case itself, especially Sergent's proofs of claim; (3) the Bankruptcy Court's authorization of a CRO; (4) the liquidation plan and McKinstry's objections to that plan; (5) the history of corporate officer and director liability before the merger of law and equity; (6) the Engagement Letter and Settlement Agreement; and (7) McKinstry's complaint. That same complexity is what makes it impossible for the Sixth Circuit to "quickly and cleanly" review the jury-trial issue "without having to study the record." *Ahrenholz v. Bd. of Trs.*, 219 F.3d 674, 677 (7th Cir. 2000). Indeed, these same pieces of the record would be necessary background for an immediate appeal as well as a second appeal at the end of this case, and prudence counsels against asking the Sixth Circuit to learn the case twice.

On the flip side, even in the unlikely event that the Sixth Circuit disagrees with the Court's conclusion in a post-trial appeal, a new trial would not be necessary. At best, any error would be harmless if "it is clear from the record that the [Court] would have reached the same conclusion as the jury." *Dombeck v. Milwaukee Valve Co.*, 40 F.3d 230, 237 (7th Cir. 1994). At worst, the Sixth Circuit would remand the case for the limited purpose of allowing the Court (or the Bankruptcy Court) to issue its own factual findings and legal conclusions based on the jury-trial record. *Id.*; *Cargill, Inc. v. Commodity Credit Corp.*, 275

17

F.2d 745, 751 (2d Cir. 1960); *Hurwitz v. Hurwitz*, 136 F.2d 796, 799 (D.C. 1943); *Great Am. Ins. Co. v. Johnson*, 25 F.2d 847, 850 (4th Cir. 1928). The Court will ensure that the jury-trial record is sufficient to serve as the basis for its independent factual findings and legal conclusions. The parties should prepare accordingly.

It is therefore **ORDERED** that the A&M Parties' and Sergent's motions to certify the Court's March 21, 2012 Order for interlocutory appeal, R. 26; R. 27, are **DENIED**.

This the 28th day of August, 2012.

Signed By:
*Amul R. Thapar* AT
United States District Judge

18